Robert N. DREW

v.

The STATE of Texas, Appellee.

No. 69249.

Court of Criminal Appeals of Texas, En Banc.

Sept. 30, 1987.

William M. Kunstler, Ronald L. Kuby, New York City, Rita Lucido, Houston, for appellant.

John B. Holmes, Jr., Dist. Atty., and J. Harvey Hudson, Asst. Dist. Atty., Houston, Robert Huttash, State's Atty., Austin, for the State.

## OPINION

ONION, Presiding Judge.

This is an appeal from a conviction for capital murder. V.T.C.A., Penal Code, § 19.03(a)(2). The death penalty was imposed by the court after the jury affirmatively answered the special issues submitted under Article 37.071, V.A.C.C.P.

On appeal appellant raises twelve points of error. Appellant contends the trial court erred in denying his out-of-time motion for new trial on the basis of a lack of jurisdiction because the "new available" evidence warranted a new trial and because jury misconduct occurred when parole was discussed.

Appellant further challenges the sufficiency of the evidence to prove that the murder was committed in the course of committing robbery of the deceased, and challenges the sufficiency of the evidence to support the affirmative finding to the second special issue submitted—that appellant would commit future acts of violence that would constitute a continuing threat to society.

In four points of error appellant complains of improper jury argument of the prosecutor, and in two other points of error appellant urges the trial court erred in sustaining challenges for cause to veniremen Grover Smith and Archie Cotton.

We shall examine the points of error in the order in which they were alleged to have occurred.

## VOIR DIRE EXAMINATION

■ Appellant complains in one point of error that "a prospective juror, Grover Smith, was improperly excused for cause based on his reluctance to impose the death penalty." The State's challenge for cause to Smith was sustained because Smith would require a stricter standard of proof than "beyond a reasonable doubt" in a capital murder case. When first questioned by the trial court, Smith stated he did not have any conscientious scruples against the infliction of death as a punishment for a crime in a proper case after earlier saying he didn't know whether he could or not. When the prosecutor asked about his feelings on the death penalty Smith replied that it would have been shown that "the man did without questionable doubt," that it would have to be "one hundred percent sure," that the testimony must be such that it "erased all doubt in my mind," that the burden of proof must not just be beyond a reasonable doubt but "one hundred per cent," that he would require a higher degree of burden of proof in capital murder cases than other types of criminal cases, and that proof must be "beyond a shadow of doubt." Upon examination by appellant's counsel Smith twice stated he would require a "stricter burden of proof than the strongest required by law" but that the State could prove to him that death was an appropriate penalty for a crime. Upon further examination by the State he made clear his standard was different in capital murder cases than for other types of criminal cases and it would be a stricter burden. The challenge for cause was sustained over objection.

Article 35.16(b)(3), V.A.C.C.P., provides that a challenge for cause may be made by the State, if the juror "has a bias or prejudice against any phase of the law upon which the State is entitled to rely for conviction or punishment." This Court has applied said statute in upholding the excusal for cause of a prospective juror who would hold the State to a more stringent burden of proof than beyond a reasonable doubt. See *Sawyers v. State*, 724 S.W.2d

24 (Tex.Cr.App.1986); *Goodman v. State*, 701 S.W.2d 850, 861 (Tex.Cr.App.1985); *Franklin v. State*, 693 S.W.2d 420 (Tex.Cr.App.1985), cert. den. 475 U.S. 1031, 106 S.Ct. 1238, 89 L.Ed.2d 346 (1986); *Woolls v. State*, 665 S.W.2d 455, 465 (Tex.Cr.App.1983); *Hawkins v. State*, 660 S.W.2d 65, 76 (Tex.Cr.App.1983); *Bodde v. State*, 568 S.W.2d 344, 349 (Tex.Cr.App.1978). Appellant's point of error is overruled.

■ In another point of error the appellant contends prospective juror, Archie Cotton, was improperly excused for cause, "based upon his refusal to impose the death penalty unless he saw a probability that the appellant would commit future murders."

In response to the initial inquiry by the court Cotton said he had no conscientious scruples against the infliction of death as a punishment for a crime in a proper case, and that he would affirmatively answer the special issues yes if the State sustained the burden beyond a reasonable doubt.

The prosecutor then explained there were groups of individuals with different views on the death penalty, one group who believed it to be the only penalty if the accused is found guilty of capital murder, another group who could not assess the death penalty, regardless of the facts, who would vote against it in an election on the issue, etc., and a third group who contended it depended upon the facts of each case whether the death penalty is proper, etc. The prosecutor then inquired about Cotton's feelings about the death penalty, what group he was in. Cotton then explained that he would vote against the death penalty as an issue in an election "but talking about in a trial, if I feel a man deserves the death penalty I give it to him. . . . I am against the death penalty but if it came out in the trial I vote guilty on both of those questions I can do that." He explained his feelings were based on his religion and "Thou shall not kill." The record then reflects:

"Q. What would make you able to vote for it if you are against it?

"A. Well, after hearing some evidence, you know, at a trial.

     *    *    *    *    *    *

"Q. ... First of all ... we know you are against that by your religion but you can do it if you have to?

"A. Yeah."

Later the prosecutor inquired whether he (Cotton) could answer the special issue [Article 37.071(b)(2) ] "yes" if he was convinced a defendant was probably going to commit criminal acts of violence but not convinced the defendant was "going to murder again." Cotton answered, "no," that the State had to show him "a whole lot of proof" and include proof of murder, that a defendant "might rob and rape and beat up on people, etc.," but without probability of more murder he would not vote "yes" on the special issue.

The court, upon further explanation of the law, inquired,

"Q. In other words, the only way they could possibly do that as far as your mind is concerned is to show you that he is liable to commit another murder, not some rape or robbery or assault but another murder, another taking of a person's life intentionally. That's what they would have to show you before you would vote yes to that. Is that what you are saying?

"A. *Yeah. That's what I am saying.*

"Q. So, you are telling the State that there is no way that you can prove beyond a reasonable doubt to me that there is a probability he will commit future acts of violence that will be a continuing threat to society unless you show me he is going to do a murder; is what (sic) what you are telling us?

"A. It is something like that. Yes.

"Q. Is that what you are saying?

"A. *That's what I am saying.*

"Q. All right. And then there is no way that you could answer that question any other way?

"A. Not at this time." ,(Emphasis supplied.)

Appellant's counsel attempted to explain that in offering evidence in support of special issue two the State was not restricted to murders, and attempted to rehabilitate Cotton. He succeeded to the extent of getting Cotton to state that based on the evidence he could answer special issue two yes or no.

The record then reflects:

"Q. And if the State satisfied you the defendant would commit criminal acts of violence that would constitute a continuing threat to society and you heard all of the evidence and that was your conclusion, you would answer it yes. Right?

"A. Yes."

The prosecutor then followed with these inquiries:

"Q. ... you told him [defense counsel] if the evidence was right you could answer that second question yes. Is that right?

"A. Yeah.

"Q. To make the evidence right *would you have to see a probability of more murders in the future?*

"A. *Yeah. In my mind I have to.*

"Q. No matter how violent you think the defendant may be in the future, *if you don't see a murder down the road you are not going to vote yes, is that correct?*

"A. If I don't see a murder down the road I am not going to vote yes?

"Q. If you don't think he is going to commit another murder down the road you are not going to vote yes?

"A. Uh uh." (Emphasis supplied.)

The State's challenge for cause was sustained over objection.

Article 37.071(b)(2), supra, requires jurors in a capital murder case to determine whether there is a probability that the defendant would commit criminal *acts of vio-*

*lence* that would constitute a continuing threat to society.

■ Although the phrase "criminal acts of violence that would constitute a continuing threat to society" is not defined in the Code of Criminal Procedure, there is nothing in our case law to limit this portion of Article 37.071(b)(2), supra, to future murders. The Government Code requires that words and phrases which are not defined "shall be read in context and construed according to the rules of grammar and common usage." Tex.Gov't.Code Ann., § 311.011(a) (Vernon Supp.1986).

This Court has determined that the following offenses constitute crimes of violence per se: arson [*Hamilton v. State,* 676 S.W.2d 120, 121 (Tex.Cr.App.1984)]; robbery [*Mena v. State,* 504 S.W.2d 410, 414 (Tex.Cr.App.1974)]; robbery by assault [*Scott v. State,* 571 S.W.2d 893, 895 (Tex.Cr.App.1978)]; rape [*Wisdom v. State,* 708 S.W.2d 840, 845 (Tex.Cr.App. 1986)].[1]

We do not interpret the phrase "criminal acts of violence that would constitute a continuing threat to society" as by any means being limited to future murders.

Cotton would require the State to shoulder a greater burden of proof than the law requires.

In *Goodman,* supra, at 861, this Court wrote:

"We find that the State's challenge for cause of prospective juror Mauldin was proper since Mauldin indicated that he would not be able to answer the special issues in the affirmative unless the State met his stricter standard of proof. See *Hawkins v. State,* 660 S.W.2d 65 (Tex.Cr. App.1983); and *Bodde v. State,* 568 S.W. 2d 344 (Tex.Cr.App.1978). Moreover, again according due deference to the trial court's position to assess Dr. Mauldin's demeanor and sincerity, we find that the trial court did not abuse its

---

1. Burglary is not a crime of violence per se, and therefore the State must prove that the offense involved an act of violence or threatened violence to property. *Gardner v. State,* 699 S.W.2d 831, 833 (Tex.Cr.App.1985). Under the provi-

sions of V.T.C.A., Penal Code, § 46.05, "[a] person who has been convicted of a felony involving an act of violence to a person or property commits an offense if he possesses a firearm away from the premises where he lives."

discretion. See *Franklin,* supra." See also Article 35.16(b)(3), V.A.C.C.P.

The court did not err in excusing prospective juror Cotton for cause.

## SUFFICIENCY OF THE EVIDENCE

■ In two points of error the appellant challenges the sufficiency of the evidence. A recitation of the facts becomes necessary.

The record reflects that on February 17, 1983, 17–year–old Jeffrey Leon Mays, the deceased, and his high school friend, Bee Landrum, left Alabama headed for Fort Walton, Florida to find work. Mays, who had been a straight A student, had experienced difficulty with the use of marihuana and had been placed by his parents in two different institutions for rehabilitation. When he returned home he was placed in a different high school, West Jefferson High School in Praco, Alabama. There he met Landrum, who had also experienced difficulties with alcohol and drugs. The two decided to run away because they were not "getting along at home." Landrum provided a 1973 Maverick which was registered in his mother's name, and Mays contributed approximately eight dollars and some food taken from home.

Landrum and Mays reached Fort Walton on February 18, however, Landrum testified that their car got stuck on the beach and could not be driven out of the sand. The boys remained with the vehicle for approximately 24 hours until a passerby was flagged down to help pull the car free. After pawning a guitar for "about thirty dollars," Landrum and Mays left Florida on February 19.

The boys next intended to drive to Fort Polk, Louisiana, to visit Mays' girlfriend, Tammy. Along the way they picked up a hitchhiker named John Sly, who suggested they spend the night at the Salvation Army in Lafayette. Shortly before breakfast on the morning of February 21, Landrum and Mays met "Frenchy," the appellant Drew, who indicated that he and a man named Frank needed a ride to Franklin, Louisiana. Although the drive to Franklin would take the boys 30 miles east of Lafayette, Frank assured them that he could get money there and that he would buy more gas for their car.

While Sly remained in Lafayette to sell his blood, Landrum, Mays, Frank and the appellant drove to Franklin about 9 a.m. Upon arriving, Frank immediately went to his bank to withdraw some money. He then checked into a motel room and bought beer and pizza for everyone. Frank also filled Landrum's car with gas and gave appellant sixty-five dollars before taking leave of the group. At approximately 2:00 p.m. the trio took leave of Frank and proceeded to drive back towards Lafayette.

Initially Mays drove the car from the motel. After three or four blocks, however, the appellant indicated that he wanted to drive. En route to Lafayette the appellant realized that he had forgotten his jacket at the motel and abruptly made a U-turn to drive back. In the process he got Landrum's car stuck in the mud of the highway median. Appellant subsequently tried to raise the rear wheels of the car with a bumper jack, but succeeded only in cutting his eye when the jack handle slipped and struck his face. Numerous drops of blood were spilled across the trunk of the car.

Eventually, the car was pulled from the mud with the help of a passing motorist, and appellant continued to drive to Franklin. Appellant retrieved his jacket, and on the return trip to Lafayette swerved out of his lane and hit an oncoming vehicle, tearing the chrome from the side of Landrum's car. After a brief conversation with the other driver, the trio proceeded on to Lafayette.

In Lafayette appellant spent ten dollars to retrieve Mays' radio, which had been pawned to buy gas for the trip to Franklin. The trio left Lafayette heading west on I–10 when Landrum recognized John Sly hitchhiking on a road which lead to the freeway. Sly had unsuccessfully tried to sell his blood in Lafayette and accepted the offer of a ride. Within an hour the group picked up a fifth person named Ernest Puralewski, who introduced himself as "Mike."

At this time Jeff Mays was again driving, the appellant sat next to him in the front passenger seat, and the other three men sat in the back seat.

Landrum testified that everyone was drinking beer except Mays, and although Landrum could not remember how much beer was purchased, he stated that "it was a lot." At one point a marihuana cigarette was passed around and everyone smoked but Mays. Mike and the appellant struck up a conversation, and according to Landrum discussed "[m]otorcycles, prison, Charles Manson." Mike Puralewski stated he was "on the run" and that he had been in a California prison with Manson. The others did not join in the conversation. When the group next stopped to buy beer, the appellant took the keys from the ignition and went into the store with Mike. While they were in the store buying beer and oysters, the other men noticed that they were pointing at the car and Landrum suspected that they were plotting to "jump on us or something." He asked Sly whether he would help them should such a situation arise. After returning to the car with more beer, the appellant returned the keys to Mays, who continued driving toward Houston.

By this time Mays was apparently unnerved by the actions of Mike and the appellant, and stated that he wanted to stop and call his parents. After placing the call, Mays returned to the car and stated that his father had suffered a heart attack and that he had to return to Alabama.[2] John Sly testified that appellant insisted that Mays take them to Houston and that they were not going to Alabama.

John Sly testified to the following:

"Q. What happened then when Frenchy said that?

"A. Said that? Jeff said he was going back to Alabama.

"Q. What do you recall at that point?

"A. I believe at that point Frenchy hit him.

"Q. Hit Jeff?

"Q. Yes.

"Q. Do you recall how he hit him?

"A. In the face.

"Q. Fist, open hand?

"A. Fist."

The trip was resumed after the appellant persuaded Mays to join him in a prayer for his father. Appellant nevertheless developed what Sly described as a "mean mood." Sly testified that appellant held a knife to Landrum's throat, stating: "I ought to cut your throat in a second." He repeated this threat to Sly and said: "I am scooter trash and I'll cut your throat this second." This testimony was corroborated by Landrum, who stated that "Frenchy was in the front seat and he was leaning back and talked about cutting people's throats."

Shortly thereafter appellant wrapped his arm around Mays' neck, put the knife to his neck and ordered Mays to pull over. Mike, who was armed with a knife he had obtained from Landrum while Mays made his phone call, pulled Sly out of the car and threw him against the rear fender. Landrum also tried to exit the vehicle, but was stopped by the appellant who said "if you try anything you are dead." After robbing Sly of ten or twelve dollars, Mike gave him a shove and told Sly to "get your ass out of here."

At this point Mays was still driving, with the appellant sitting next to him, and Mike holding his knife to Landrum's ribs in the back seat. Shortly thereafter the car was stopped and Landrum was ordered to the driver's seat, while Mays and the appellant moved to the back seat. According to Landrum appellant started "hitting Jeff in the back seat and calling him names." Appellant called Mays a "punk" and accused him of lying about the phone call. Appellant continued to hit Mays in the face and

2. It is doubtful whether Mays actually made the phone call to his parents. Landrum testified that he was not sure if Mays really spoke to his mother, stating that he "picked up the phone and dialed a number and said, hey, mom." John Sly testified that Mays secretly confided that "my dad is not having a heart attack. I want to get rid of the two other hitchhikers." Rebecca Mays, Jeff's mother, testified that she received a phone call from him on February 21, from a hotel room and that she did not hear from her son again.

throat until his blood was splattered on the door and back seat. Landrum testified that Mays offered no resistence and did not try to defend himself.

Landrum also testified that the appellant repeatedly told Jeff Mays that he was going to die and "told Jeff that he was bleeding on his leather [jacket]." Landrum stated that appellant wiped blood on the back of his [Landrum's] neck and licked the blood off his hands, saying that "nobody gets blood on me for nothing...."

According to Landrum, Mike "said if you [are] going to do it, get everything he has got so he won't have no identification." Appellant then took Mays' watch and wallet. The appellant allowed Mays to get out of the car, however, Landrum testified that before the car pulled away "Jeff said something under his breath or something like you are not going to get away with this or you are on the run or something." Both Mike and the appellant got out and forced Mays back into the car. Landrum stated that one of the men "said that he [Mays] should have kept his mouth shut and now he is going to die."

Landrum further testified that Mike and the appellant debated about who would kill Mays, before deciding that they would both do it. Landrum was ordered to pull the car to the side of an access road on I–10, where Mike and the appellant pulled Mays out of the right side of the car. Watching through the rear view mirror, Landrum saw the appellant pull Mays' head back and make a slashing motion across his throat, while Mike also stabbed the victim. Landrum stated that he "heard Jeff's lungs or something," "[l]ike letting air out of something."[3]

After rolling Mays' body into a ditch, the two men reentered Landrum's car, handed him the keys, and said "let's go." Landrum drove for "[t]en or fifteen or twenty miles" to a service station where Mike and the appellant bought some beer. One of the beers was used to wash off the buck

knife that Landrum had given Mike. Landrum recalled that Mike "said that he wished he hadn't had to do that [kill Mays]," to which the appellant replied: "I fucking enjoyed it because it got blood on my leather."

Karen Darlene Lyas, a 19–year–old cashier at a convenience truck stop in Baytown, testified that at 10:45 p.m. on February 21, two men entered the store to buy beer. Lyas testified that the man who "come up to the counter had a cut over the left eyebrow and blood all over his clothes and on him and he told me he had been in a fight in Louisiana, for me not to be nervous because he had been in a fight." Lyas stated that she had her finger on the alarm button during the entire time that Mike and the appellant (whom she later identified) were in the store. When the car drove off, Lyas tried to get the license plate number, but observed that it was illegible due to a heavy covering of mud and dirt. Approximately 10 minutes after Mike and the appellant left the store, two men came running in to inform Lyas that someone had been hit half a mile down the road toward Houston. Lyas testified as follows:

"Q. What did do you (sic) when you got that information?

"A. I called the Sheriff's Department and they sent an officer out there.

     \*     \*     \*     \*     \*     \*

"A. After I called about somebody laying on I–10 and I got to thinking about the ones that had been in there before and the blood on him and they didn't sound right and I called the police back and told them about that."

The trio continued their drive, stopping only at a Country Kettle restaurant before arriving at a night club called Boobie Rock in Houston. On cross-examination Landrum was asked whether he knew of any reason during the time after Mays' death

---

**3.** Dr. Eduardo Bellas, assistant medical examiner for Harris County, testified that Jeff Mays sustained seven stab wound to the left side of the chest and six to the right side of the midline. Jeff also received "two cutting type wounds on the neck." Three stab wounds penetrated into the chest cavity and were lethal. Two of the wounds penetrated the left lung and one pierced the pericardium of the heart. It was the three chest wounds that caused the death.

why Mike and the appellant might want to kill him. Landrum testified:

"A. I think they wanted my car.

"Q. Did they say as much?

"A. They asked me for the bill of sale to the car, the papers or whatever goes with it."

The three men stayed at the Boobie Rock for only a short while before Mike stated that "he wanted to roll a faggot," and left to enter a "faggot bar" across the street. Landrum testified that he and the appellant waited in the car for Mike to return. When Mike did not return, Landrum and the appellant left, with the appellant driving Landrum's car.

The appellant was pulled over in the 5400 block of Kirby at approximately 3:30 a.m. on February 22, by Patrolman Michael Grabowski of the West University Place Police Department. After confirming that the Maverick was speeding, the officer noticed that the license plate was illegible due to a layer of mud and that the driver failed to use his turn signals as required by law. The vehicle was pulled over, and the officer observed blood on the appellant's clothing.[4] Landrum also stepped out of the car holding his hands up in the air and appearing to be very nervous. According to Officer Grabowski, Landrum's behavior contrasted dramatically with the appellant's very calm demeanor.

When the appellant produced Mays' driver's license, the officer became convinced that appellant was not the person pictured on the license. Grabowski approached Landrum and noticed that he was "very, very pale; very, very nervous; almost in a state of shock." Shortly thereafter a back-up officer arrived, followed by a Southside police officer who relayed a teletype message advising all Houston area police officers that the Maverick was possibly a wanted vehicle.[5] Upon receiving this information the suspects were placed on the ground at gunpoint, searched and arrested. The officers recovered a silver knife from the appellant, as well as the deceased's wallet, watch, and jacket.

The appellant offered no evidence at the guilt stage of the trial.

Appellant alleges in a point of error that the evidence was insufficient to prove that the murder was committed in the course of committing a robbery of the deceased, Jeffrey Mays, as charged in the indictment.

Appellant contends the murder was committed because the deceased lied to appellant and other passengers about a telephone call to Alabama and that the robbery was carried out for the sole purpose of preventing the identification of the murder victim. Attention is called to Landrum's testimony that "Mike" Puralewski told appellant "If we're going to do it, get everything he has got so he won't have any identification." Appellant argues "there may be evidence to prove a robbery and a murder, but no evidence to prove that the murder was 'in the course of' committing the robbery."

V.T.C.A., Penal Code, § 19.03(a)(2), reads in part:

"Capital Murder

"(a) A person commits an offense if he commits murder as defined under Section 19.02(a)(1) of this code and:

\*    \*    \*    \*    \*    \*

"(2) the person intentionally commits the murder in the course of committing or attempting to commit ... rob-

---

4. Landrum testified that when the police stopped the car appellant was wearing Mays' jacket. He stated that Mike had stolen the appellant's jacket and that the appellant put Mays' jacket on when it got cold.

5. The teletype reads in relevant part:
   "[S]pecial attention. Houston area aggravated robbery and possible kidnapping suspects. 1970 or '71, orange Vega or Maverick, a four-door, unknown Alabama license. Has dent on left rear fender and chrome missing. That fender offense occurred approximately 2145 hours this date. Vehicle last seen west bound on I-10. Suspects earlier made statement going to Houston. Two 'suspects' were picked up by suspects in above vehicle. Suspects robbed another hitchhiker who was riding. Abandoned him and forced 'driver' at knife point to drive on."

bery, ..." [6]

Section 19.03(a)(2), supra, has also been construed "to mean conduct occurring in an attempt to commit, during the commission, or in immediate flight after the attempt or commission of the offense, i.e., in this case, of robbery." *Riles v. State,* 595 S.W.2d 858, 862 (Tex.Cr.App.1980); see also, *Fierro v. State,* 706 S.W.2d 310, 313 (Tex.Cr.App.1986); *Anderson v. State,* 701 S.W.2d 868 (Tex.Cr.App.1985); *Autry v. State,* 626 S.W.2d 758, 762 (Tex.Cr.App.1982). In an analogous situation it was held that the fact that an aggravated rape was committed *prior* to the events leading to the death of the victim who was killed in the flight *after* rape did not result in a finding that the death of the victim was not caused in the course of committing aggravated rape. (Emphasis added.) *Wooldridge v. State,* 653 S.W.2d 811, 816 (Tex.Cr.App.1983).

Without reiterating all the facts it is observed that after "Mike" Puralewski was picked up each time the car was stopped the appellant took the keys from the ignition to maintain control of the vehicle. After the deceased "made" the telephone call and sometime after their travel resumed, appellant with a knife threatened Landrum, Sly and the deceased who was forced to stop the car. Puralewski forced Sly out of the vehicle and took ten dollars from him at knife point while appellant restrained Landrum in the car. Sly was left behind. Later appellant began beating Mays and took at special demand from him his watch and billfold. The deceased Mays was then forced from the car and when he verbally protested such action, he was forced back into the car, taken to another point along the highway where he was killed. Landrum was asked for a bill of sale to the car and papers and he was threatened with death repeatedly. When the Houston police stopped appellant and the very frightened Landrum, appellant was wearing the deceased's jacket, had the deceased's biker's wallet and displayed the deceased's driver's license to the officer as his own.

In *Fierro,* supra, at 313 (Tex.Cr.App. 1986), it was recently held that the intent to

steal may be inferred from actions or conduct. See also *Banks v. State,* 471 S.W.2d 811, 812 (Tex.Cr.App.1971); *Johnson v. State,* 541 S.W.2d 185, 187 (Tex.Cr.App. 1976). In *Fierro,* supra, there was no verbal demand made of the victim for money or property prior to the shooting, however, it was decided that "a verbal demand is not the talisman of an intent to steal" and that such intent could be inferred from actions and conduct. In the instant case a specific demand for the property was made and the appellant was in possession of the property when he was apprehended. The fact that the deceased was murdered subsequent to being deprived of his personal property under the circumstances described does. not vitiate the intent to steal.

Viewing the evidence in the light most favorable to the jury's verdict, we hold that the evidence was sufficient for the rational trier of facts to find all the elements of the offense charged beyond a reasonable doubt. *Jackson v. Virginia,* 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979); *Wilson v. State,* 654 S.W.2d 465 (Tex.Cr.App. 1983) (Opinion on Rehearing); *Fierro,* supra, at 313; *Cannon v. State,* 691 S.W.2d 664, 675 (Tex.Cr.App.1985).

Appellant's point of error is overruled.

■ Further, the appellant argues the evidence was insufficient to warrant a finding that the appellant would commit future acts of violence that would constitute a "continuing threat to society." See Article 37.071(b)(2), V.A.C.C.P.

In addition to the evidence offered at the guilt stage of the trial the State, at the penalty stage, called David Karas, appellant's probation officer in Florida. He testified that appellant was on probation for possession of marihuana, and had been given three years' probation following a guilty plea, and that subsequently the probation had been elevated to five years under Florida law. Karas stated that appellant had been "given permission to transfer to Virginia," but that he had not been given permission to "be in South Carolina, Louisiana or Texas."

---

**6.** See V.T.C.A., Penal Code, § 29.02 (Robbery).

John Robert Booth testified that he had owned a part interest in the Twilight Restaurant and Bar in Columbia, South Carolina, that a person named Kim was hired as a waitress there, that he originally became acquainted with the appellant when he was first introduced as the boyfriend and then husband of Kim, that Kim worked at the restaurant for a month and a half and that her employment was terminated because of "too many problems ... on the premises" with appellant. Booth also testified that about a week and a half after Kim had been fired, appellant appeared at the restaurant looking for her, that there was a Christmas party for employees of the Piggly Wiggly stores, that appellant joined the party without invitation, and that he asked appellant to leave because "he had been undesirable on the premises before" and had to be forcibly removed on one occasion. One Piggly Wiggly employee, however, later approved appellant's presence. That night after closing the restaurant appellant had gone to a neighbor's house to watch a movie on Home Box Office and he fell asleep. When he awoke the appellant had him by the throat and had a knife in his hand. Appellant stabbed Booth three times in the chest and was cut twice in the hand during the struggle. Booth hit appellant, who appeared to be drunk, with a ashtray and kicked him and called for help and appellant fled. Booth testified that appellant was later arrested and charged with a felony, but it was reduced to misdemeanor assault after he agreed on condition that appellant be required to return to Florida.

Booth related that he had had a previous conversation with appellant who showed him a scar where he had been stabbed in a fight with a knife.

Booth testified that appellant's reputation for being a peaceable and law-abiding citizen was bad.

Appellant called his maternal uncle, Donald Martelle, from Arkoma, Oklahoma. He testified that the 24–year–old appellant, born on April 8, 1959, had come from a broken home where there had been fighting and financial problems, that he had been raised by his maternal grandparents, that he had been an average student in school, had served in the Army and received a medical discharge under honorable conditions, that appellant had been married and divorced, had one child, that he had "pretty much drifted," working at odd jobs, and that he had a severe drinking problem. Martelle testified he offered to teach appellant how to be a carpenter and that appellant was on his way to Oklahoma when the alleged offense occurred.

In answering the special issues submitted under Article 37.071, V.A.C.C.P., including the issue of future dangerousness, the jury may consider all of the evidence admitted at the first or guilt stage of the bifurcated trial. *Garcia v. State*, 626 S.W. 2d 46 (Tex.Cr.App.1981), and cases there cited; *Bravo v. State*, 627 S.W.2d 152 (Tex. Cr.App.1982); *Russell v. State*, 665 S.W.2d 771, 781 (Tex.Cr.App.1983), cert. den. 465 U.S. 1073, 104 S.Ct. 1428, 79 L.Ed.2d 752; *Smith v. State*, 676 S.W.2d 379, 393 (Tex. Cr.App.1984).

It has been said that the circumstances of the offense and the facts surrounding it may furnish greater probative evidence than any other evidence regarding the second special issue (future dangerousness) submitted to the jury at the penalty stage of a capital murder case. *Duffy v. State*, 567 S.W.2d 197 (Tex.Cr.App.1978); *Bush v. State*, 697 S.W.2d 397, 399 (Tex.Cr.App. 1985); *Fierro v. State*, 706 S.W.2d 310, 319 (Tex.Cr.App.1986); *Carter v. State*, 717 S.W.2d 60 (Tex.Cr.App.1986). See also *Smith v. State*, 676 S.W.2d 379, 393 (Tex. Cr.App.1984); *Mitchell v. State*, 650 S.W. 2d 801, 812 (Tex.Cr.App.1983). And it has been said that the circumstances of the capital murder offense charged, if severe enough, can be sufficient alone to sustain an affirmative finding as to a defendant's likelihood to commit future acts of violence. *Hawkins v. State*, 660 S.W.2d 65 (Tex.Cr. App.1983); *Williams v. State*, 668 S.W.2d 692 (Tex.Cr.App.1983); *Turner v. State*, 698 S.W.2d 673, 675–676 (Tex.Cr.App.1985).

While it may be true, as appellant claims in his brief, that the evidence does not show he began the day searching for a

victim to assault and rob, it is nevertheless clear that once the opportunity presented itself, and he decided to commit the offense he executed a calculated plan of attack. A pattern of intimidation began with his appropriation of the ignition keys of the car belonging to someone else. This was followed by observed conversations between appellant and the codefendant. There was implementation of a ruse which succeeded in disarming Bee Landrum. What followed was the coordinated assault upon the other occupants of the car by appellant and his codefendant. The circumstances surrounding the murder of Mays were particularly grisly. Appellant delighted in openly licking the victim's blood from his own fingers and hands. When the codefendant expressed regret immediately after the killing the appellant disagreed and said, "I fucking enjoyed it...."

When the evidence at the guilt stage is viewed together with evidence of the assault in South Carolina, the probation for possession of marihuana, the reputation testimony and other circumstances, there is represented a dangerous aberration of character which would render a jury's affirmative findings as to the second special issue justified. See *King v. State*, 631 S.W.2d 486 (Tex.Cr.App.1982); *Cass v. State*, 676 S.W.2d 589, 593 (Tex.Cr.App. 1984).

Viewing the evidence in the light most favorable to the jury's verdict, see and cf. *Jackson v. Virginia*, 443 U.S. 307, 319, n. 12, 99 S.Ct. 2781, 2789, n. 12, 61 L.Ed.2d 560 (1979); *Wilson v. State*, 654 S.W.2d 465 (Tex.Cr.App.1983) (Opinion on Rehearing); *Starvaggi v. State*, 593 S.W.2d 323 (Tex.Cr.App.1979), we find the evidence sufficient to support the jury's affirmative finding to the second special issue under Article 37.071, supra. See *Crawford v. State*, 617 S.W.2d 925 (Tex.Cr.App.1980), cert. den. 452 U.S. 931, 101 S.Ct. 3067, 69 L.Ed.2d 431; *Green v. State*, 682 S.W.2d 271 (Tex.Cr.App.1984); *Smith v. State*, 683 S.W.2d 393 (Tex.Cr.App.1984); *Thompson v. State*, 691 S.W.2d 627 (Tex.Cr.App.1984);

*Carter v. State*, 717 S.W.2d 60 (Tex.Cr. App.1986).

The point of error is overruled.

## JURY ARGUMENT

In five points of error appellant complains of the prosecutor's jury argument at the guilt stage of the trial.

In one point of error appellant complains the prosecutor in argument repeatedly vouched for the credibility of his witnesses, misstating the record and proclaiming his personal belief in their veracity. The argument was made without objection and nothing is preserved for review. *Esquivel v. State*, 595 S.W.2d 516, 522 (Tex.Cr.App. 1980), cert. den. 449 U.S. 986, 101 S.Ct. 408, 66 L.Ed.2d 251.

As appellant points out after his counsel concluded his argument, "the prosecutor sought to *rehabilitate* Landrum's credibility, stating '[N]obody is here to try to tell somebody what to say or make the story better by suggesting Bee Landrum or any other witness say something in a way that did not happen.... What it boils down to, you have got to do what is right and there is a lot of people trying to do what is right. I think Bee Landrum was trying to do what was right." (Emphasis supplied.)

Later appellant complains of additional argument that "John Sly came over here when he told them he first reported that he would when he was in jail or not and by God he is back here doing what he believes is right. You can take into fact that he has pleaded guilty to seven felonies before and been to prison but it shocks his conscience, too."

First, we find the complained of argument, unobjected to, is taken out of context. Next the prosecutor has a right to make reasonable deductions from the evidence, and a prosecutor can argue his opinions concerning issues in the case so long as they are based on the evidence in the record. *Ramos v. State*, 419 S.W.2d 359, 368 (Tex.Cr.App.1967). We need not discuss the question of whether the argument was also invited by the argument of appel-

lant's counsel. The point of error is overruled.

■ In another point of error appellant complains that the prosecutor resorted to name calling and verbal abuse during argument. Appellant calls attention to the fact that the prosecutor called him a "macho man," "a man who could kill for so little reason," "a sadistic killer," and referred to the trip from Louisiana to Texas as a "rolling torture chamber," a "rolling chamber of torture" and a "chamber of execution."

To none of these remarks were any objections interposed and nothing is preserved for review. *Esquivel v. State*, supra; *Sanchez v. State*, 589 S.W.2d 422, 424 (Tex.Cr.App.1979); *Romo v. State*, 631 S.W.2d 504, 505 (Tex.Cr.App.1982). The point of error is overruled.[7]

■ In another point of error appellant complains that the prosecutor stated to the jury that "The Judge [is] telling you that you have to find [appellant] guilty."

The complained of argument came at the conclusion of the following argument:

"And the Judge told you, tells you in the charge when you are in the course of committing or attempting to commit robbery, that means during the commission or during the escape from. It doesn't mean it can only be five seconds. It can be hours. And that's what you have got here an ongoing robbery not only of Jeffrey Leon Mays but of Sly and of Bee Landrum and you can see that.

"The Judge tells you what an owner is. You are an owner of property if you got [sic] title to it, possession of it, or a greater right of possession of it than does the person stealing it. bee is the owner of the car. He has got a title to it. You are entitled to so make a conclusion

that Jeff had a greater right to that car than did this man and that this man is trying to steal that car, then Jeff may be an owner just as well as Bee—

"THE COURT: You have got five minutes.

"MR. HAGSTETTE: Thank you, Your Honor.

"What I am arguing, they didn't have a reason to kill Jeff because they were made at him and take his property just because they would identify him. They were in the course of ongoing robbery.

\*    \*    \*    \*    \*    \*

So what happens? Sly is robbed. They want the papers to the car. They take all of Jeff's property off his person. They take the rest of it with them in the car. They are in the course of committing or attempting to commit a robbery of Jeffrey Leon Mays. You can't look at this charge and come to any other conclusion.

\*    \*    \*    \*    \*    \*

I ask you to look at the facts and realize based on those facts that there is no other conclusion than that there was a robbery going on, an ongoing all day robbery. You had a rolling chamber of torture, a chamber of execution in that car. That's what that rolling party became that this defendant—guilty, guilty, more guilty than Mike of this offense. I would like you to look at the evidence and see that's the only conclusion. And I think you can see that the only way to come to this conclusion safely is by looking at the charge. The Judge needs you to do that. Realize that most of its definitions you have heard before and the Judge telling you that you have to find him guilty."

---

**7.** Similar references to a defendant have been upheld by this Court where supported by the evidence. *Duncantell v. State*, 563 S.W.2d 252 (Tex.Cr.App.1978), cert. den., 439 U.S. 1032, 99 S.Ct. 637, 58 L.Ed.2d 695 (defendant referred to as a "troublemaker" and "freeloader"); *Burns v. State*, 556 S.W.2d 270 (Tex.Cr.App.1977), cert. den., 434 U.S. 935, 98 S.Ct. 422, 54 L.Ed.2d 294 (prosecutor's reference to defendant as an "animal" not error in view of evidence); *Alvarez v. State*, 508 S.W.2d 100 (Tex.Cr.App.1974) (prose-

cutor's remark during closing argument that defendant was "dope pusher" not improper); *Murray v. State*, 505 S.W.2d 589 (Tex.Cr.App. 1974) (prosecutor's characterization of defendant as "sadistic in the way he operates" was not improper personal abuse); *Archer v. State*, 474 S.W.2d 484 (Tex.Cr.App.1971) (prosecutor's references to defendant as "a dealer," "a pusher," and as "dealing in dope" did not constitute presenting evidence outside the record).

There was no objection to this argument and nothing is preserved for appeal. *Esquivel v. State*, supra; *Sanchez v. State*, supra; *Romo v. State*, supra.

In *Thomas v. State*, 578 S.W.2d 691 (Tex. Cr.App.1979), this Court held:

"The prosecutor should not have referred to the belief or non-belief of the trial judge in explaining, as he had a right to do, how instructions get into the court's charge. *McClory v. State*, 510 S.W.2d 932 (Tex.Cr.App.1974). *But in view of the full statement of explanation*, and the court's instructions to the jury, we conclude that reversible error did not occur." *Thomas*, supra, at 697.

It is also important to keep in mind that every alleged error must be viewed in the context of the entire argument, *Mosley v. State*, 686 S.W.2d 180, 183 (Tex.Cr.App. 1985), and that isolated sentences taken out of context may take on a meaning different from that understood by the jury. See *Henson v. State*, 683 S.W.2d 702, 704 (Tex. Cr.App.1984).

In looking at the entire argument and not taking an isolated sentence out of context, and considering that the entire charge had been read to the jury, no reversible error is presented even if the error had been preserved. "Unless the arguments of the prosecutor are so prejudicial that no instruction could cure the harm, the failure to timely object waives any error. *Green v. State*, 682 S.W.2d 271, 294 (Tex.Cr.App. 1984), cert. den., 470 U.S. 1034, 105 S.Ct. 1407, 84 L.Ed.2d 794.

■ Appellant complains that "[D]uring closing argument [at the guilt stage of the trial] the prosecutor repeatedly misstated the material elements of capital murder, depriving appellant of a fair trial."

It is appellant's contention that the prosecutor told the jury on several occasions that appellant could be convicted of capital murder if it found the murder was committed "during" a robbery, while a robbery was "going on" or there were an "ungoing" (sic) robbery instead of the murder being committed "in course of . . . robbery" as set forth in V.T.C.A., Penal Code, § 19.03(a)(2), and in the court's charge.

In his multifarious point of error the appellant calls our attention to nine different portions of jury argument where the foregoing terminology was employed. Appellant candidly admits that the defense in jury argument "hammered away at the capital murder theory" arguing there was no evidence to prove a murder in the course of a robbery. An examination of such defensive argument shows appellant's trial counsel paraphrased the provisions of said § 19.03(a)(2) by using the expression *"during* that commission or attempt to commit robbery . . . no robbery was *going on* at the time that this killing took place . . . there was no robbery going on . . . they haven't proved a robbery was going on."

We find that the prosecutor in his argument often used the identical words of the statute and referred the jury to the court's charge which used the statutory language. Like the defense, the prosecutor did paraphrase the statutory language on occasion, but to all but one of the now complained of arguments there was no objection to such argument at all. Nothing is presented for review. *Esquivel v. State*, 595 S.W.2d 516, 522 (Tex.Cr.App.1980), cert. den. 449 U.S. 986, 101 S.Ct. 408, 66 L.Ed.2d 251; *Sanchez v. State*, 589 S.W.2d 422, 424 (Tex.Cr. App.1979); *Romo v. State*, 631 S.W.2d 504, 505 (Tex.Cr.App.1982).

In the one instant where appellant calls our attention to an objection it states: "Object to this. There's no proof of any plan and argument is improper in that it is inviting the jury to speculate." Appellant's trial objection does not comport with the point of error raised on appeal and presents nothing for review. See *Sharp v. State*, 707 S.W.2d 611, 169 (Tex.Cr.App.1986); *Buxton v. State*, 699 S.W.2d 212, 217 (Tex. Cr.App.1985); *Brown v. State*, 692 S.W.2d 497, 501 (Tex.Cr.App.1985); *Cravens v. State*, 687 S.W.2d 748, 752 (Tex.Cr.App. 1985); *Gauldin v. State*, 683 S.W.2d 411, 413 (Tex.Cr.App.1984); *Green v. State*, 682 S.W.2d 271, 294 (Tex.Cr.App.1984), cert. den., 470 U.S. 1034, 105 S.Ct. 1407, 84 L.Ed.2d 794 (1985); *Hodge v. State*, 631 S.W.2d 754 (Tex.Cr.App.1982); *Vanderbilt*

*v. State,* 629 S.W.2d 709, 721 (Tex.Cr.App. 1981), cert. den., 456 U.S. 910, 102 S.Ct. 1760, 72 L.Ed.2d 169 (1982).

In the same point of error appellant complains of the prosecutor's argument implying that the jury could return a guilty verdict on the capital murder charge if they found that appellant robbed Landrum or Sly rather than the deceased Mays as alleged in the indictment.

The argument complained of was:

"And the Judge told you, tells you in the charge when you are in the course of committing or attempting to commit robbery that means during the commission or during the escape from. It doesn't mean it can only be five seconds. It can be hours. And that's what you have got here an ungoing (sic) robbery not only of Jeffrey Leon Mays but of Sly and of Bee Landrum and you can see that."

There was no objection to this argument and nothing is presented for review. *Esquivel v. State,* supra. Taken in the context of the entire argument, the evidence in the record, it is evident the prosecutor was discussing the evidence hearing on the issue of robbery. He was not telling the jury they could convict the appellant of capital murder if he robbed Landrum or Sly instead of Mays as alleged. The point of error is overruled.

In another point of error relating to jury argument, appellant complains "the prosecutor improperly appealed to the jury's sympathy, telling them that lengthy deliberations over whether or not a robbery occurred would be an insult to the victim's family."

█ At the conclusion of his summation, the prosecutor focused on whether or not the murder was committed in the course of robbery, and then made the following comments:

"Mr. Rogers told you they concede most of these points. The only question is was a robbery going on and was the defendant the one that did it. That doesn't take long. To take a long time is unfair. It's an insult to what this has been about. *It is an insult to these people here—to the Mays family and to Bee.*

"MR. ROGERS: Object to that argument, your Honor. The jury is entitled to take however long is necessary to reach a proper decision—

"THE COURT: Overruled.

"MR. ROGERS: —without mention of members of the family and so far—

"THE COURT: Overruled. It's argument.

"I am going to sit down and *ask that you come to a swift verdict* and the only verdict that is applicable under the law that of this defendant being guilty of capital murder.

"Thank you, Judge." (Emphasis supplied.)

There was no further "mention" of the Mays family, and no objection to the prosecutor's concluding remark about a swift verdict.

It is well settled that there are four primary areas of permissible prosecutorial argument: (1) summation of the evidence; (2) reasonable deduction from the evidence; (3) answer to argument of opposing counsel; and (4) plea for law enforcement. See *Cannon v. State,* 668 S.W.2d 401 (Tex.Cr. App.1984); *Denison v. State,* 651 S.W.2d 754 (Tex.Cr.App.1983); *Alejandro v. State,* 493 S.W.2d 230 (Tex.Cr.App.1973).

Even if an argument is improper, it will not constitute reversible error, unless in light of the record as a whole, it was extreme or manifestly improper, violative of a mandatory statute, or injected new facts, harmful to the accused, into the trial proceedings. *Phillips v. State,* 701 S.W.2d 875, 892 (Tex.Cr.App.1985), and cases there cited. See also *Brown v. State,* 692 S.W.2d 497, 502 (Tex.Cr.App.1985).

Unlike *Cortez v. State,* 683 S.W.2d 419 (Tex.Cr.App.1984), relied upon by the appellant, the prosecutor here was not referring to "expectations" or "demands" of the community in urging the jury not to take a long time in deciding whether a robbery was involved as the defense had conceded most of the other points, and that to do otherwise would be "an insult" to the Mays

family and to Bee Landrum. The mention was brief and not pursued after the objection.

In *Frazier v. State*, 481 S.W.2d 857, 858 (Tex.Cr.App.1972), the prosecutor argued that one could not take away the experience and painful memory of a rape victim's husband, to which the defense counsel objected. The objection and subsequent mistrial motion were overruled. It was held: "[A]lthough the argument was improper, we cannot conclude that it was of material character and calculated to prejudice the appellant when the entire record, as well as the circumstances of the case are considered. 5 Tex.Jur.2d Appeal and Error—Criminal § 436."

We conclude, when the entire argument is considered in light of the evidence adduced at trial, that the prosecutor's remarks did not rise to the level of reversible error. We cannot say that there is a reasonable possibility that the argument complained of might have contributed to the conviction. *Saylor v. State*, 660 S.W.2d 822, 824–825 (Tex.Cr.App.1983).

The point of error is overruled.

## MOTION FOR NEW TRIAL

In three points of error the appellant complains that the court erred in denying his out-of-time motion for new trial. First, he contends the trial court erred in denying his belatedly filed motion on the ground that the court lacked jurisdiction to entertain the motion. He also contends the court erred in denying said motion, without a hearing, insofar as the motion alleged the jury engaged in misconduct by discussing parole. Appellant further urges that "newly available" evidence warrants a new trial and the court abused its discretion in denying the untimely filed motion for new

trial insofar as it was based on the claim of newly discovered or "newly available" testimony. Appellant relies upon *Whitmore v. State*, 570 S.W.2d 889 (Tex.Cr.App.1977) (Opinion on Rehearing).

Appellant was sentenced on December 9, 1983. On March 7, 1984, the codefendant "Mike" Puralewski pleaded guilty to the offense of murder of Jeffery Mays and he was sentenced to serve sixty (60) years in the Department of Corrections. On March 28, 1984, Puralewski executed a sworn statement in which he stated that he alone committed the murder of the deceased, and that while appellant was present, appellant did not participate. On March 30, 1984, appellant filed his motion for new trial alleging inter alia, ineffective assistance of counsel, jury misconduct and "newly available" evidence in light of Puralewski's statement.

The motion was filed 71 days late.

Article 40.05, V.A.C.C.P., in effect at the time,[8] read in relevant part:

"Time to Apply for New Trial; Amendment

"(a) A motion for new trial, if filed, shall be filed *prior to or within 30 days after the date the sentence is imposed or suspended in open court.*" (Emphasis added.)

"The statutory method set forth in Article 40.05, as amended in 1981, does not provide for any amendment of the motion for new trial after the said 30 days, *even with leave of court.* This represents an intentional change of the former statute and requiring the filing and all amending of a motion for new trial within the said 30 days *and not thereafter.*" *Dugard v. State*, 688 S.W.2d 524, 530 (Tex.Cr.App.1985). (Emphasis added.)[9]

---

8. Now see Tex.R.App.P., Rule 31 (effective Sept. 1, 1986).

9. Previous statutory enactments included provisions granting the trial court the discretion to extend the time period for filing a motion for new trial "for good cause known."

Former Article 755, V.A.C.C.P. (1925), as amended in 1935, read in part:

"A new trial must be applied for within two (2) days after conviction; *but for good cause*

*shown,* the Court may allow the motion to be made at any time before the adjournment of the term at which the conviction was had." (Emphasis supplied.)

Similarly, Article 40.05, V.A.C.C.P. (1965), read in part:

"A motion for new trial shall be filed within ten days after conviction ... *but for good cause shown* the time for filing or amending may be extended by the court, but shall not

And in *Deloro v. State*, 712 S.W.2d 805 (Tex.App.-Houston [14th Dist.] 1986), it was held that the trial court lacked jurisdiction to grant motion for new trial filed more than 30 days after sentencing. See also *Ganim v. State*, 638 S.W.2d 628 (Tex.App.-Houston [1st Dist.] 1982); *Washburn v. State*, 692 S.W.2d 576 (Tex.App.-Houston [1st Dist.] 1985). The practical effect of this change is noted in a critical commentary by Judge Dally:

> "The trial judge no longer has the discretion to extend the time limits for filing motions or amended motions for new trial, nor may he extend the seventy-five day limit for action on the motion, but he is given the discretion to permit delayed presentment and hearing on the motion within the seventy-five day period." Dally and Brockway, *Changes in Appellate Review in Criminal Cases Following the 1980 Constitutional Amendment*, 13 St. Mary's L.J. 211, 221 (1981).

This Court has also held that a trial court cannot "grant a motion for new trial once the time limits have expired." *Ex parte Drewery*, 677 S.W.2d 533, 536 (Tex.Cr.App. 1984).

It has been written that "[t]he right to move for a new trial in a criminal case is purely statutory; it is not part of the common law grafted on the Texas system of jurisprudence. *The remedy must be pursued in the manner prescribed by statute.*" (Emphasis added.) 25 Tex.Jur.3rd., Criminal Law, § 3455, p. 312; see also, *Dugard*, supra, at 528; *Banks v. State*, 79 Tex.Cr.R. 508, 186 S.W. 840 (1916). Consequently, when appellant filed his motion for new trial 71 days after the deadline for its filing had expired, the trial court lacked jurisdiction to entertain said motion.

> "The jurisdiction of the court is a matter of statutory enactment and authority must there be found not only to hear the matter, but also to dispose of the same. In a case of jurisdiction limited over a certain thing [like granting a motion for

> delay the filing of the record on appeal." (Emphasis supplied.)

---

**10.** Article 40.07, supra, provides:

new trial], the court has the power to exercise only such limited jurisdiction." *Wilson v. State* [154 Tex.Cr.R. 39] 224 S.W.2d 234, 237–38 (1949).

"When jurisdiction with respect to a particular matter is derived wholly from statute, the statutory provisions are *mandatory* and *exclusive* and must be complied with in all respects, and the court in exercising its particular authority is a court of *limited jurisdiction.*" (Emphasis added.) 16 Tex. Jur.3rd, Courts, § 46, p. 304. Jurisdiction cannot be "substantially" invoked; it either attaches or it does not. *Ex parte Kirby*, 626 S.W.2d 533, 534 (Tex.Cr.App.1981). "Furthermore, it is likewise axiomatic that where there is no jurisdiction, 'the power of the court to act is as absent as if it did not exist,' *Ex parte Caldwell* [383 S.W.2d 587 (Tex.Cr.App.1964)]." *Garcia v. Dial*, 596 S.W.2d 524, 528 (Tex.Cr.App.1980).

The court set a date for a hearing on the said Motion for New Trial at the request of appellant's counsel. On that date (April 13, 1984), when the motion was called, appellant's counsel announced he had no witnesses available because he had heard the motion was going to be summarily overruled. The court had before it the allegations in the motion and the attached affidavits, etc., and after a colloquy at the bench including argument on the law the court overruled the motion. There was no evidentiary hearing. Neither in its verbal order nor in the subsequently filed written order overruling the motion did the court state the basis for the ruling. See Article 40.07, V.A.C.C.P., in effect at the time.[10] *Jones v. State*, 711 S.W.2d 35, 40 (Tex.Cr. App.1986) (Concurring Opinion, Onion, P.J.).

There may have been several bases for the ruling, but if the court did overrule the motion for lack of jurisdiction there was no error in light of Article 40.05, supra. Appellant's initial contention with regard to the motion for new trial is overruled.

> "In granting or refusing a new trial the judge shall not sum up, discuss or comment upon the evidence in the case, *but shall simply grant or refuse the motion, without prejudice to either party.*" (Emphasis supplied.)

Since the trial court was without authority to entertain the untimely filed motion for new trial, there was no error in refusing to consider the motion on the basis that jury misconduct had been alleged.

The same is not true, appellant insists, upon his claim that he was entitled to a new trial on the basis of newly discovered or "newly available" testimony. He relies upon *Whitmore v. State*, 570 S.W.2d 889 (Tex.Cr.App.1977) (Opinion on Rehearing), for the proposition that "where an accused's constitutional rights are in conflict with a valid procedural rule of law the procedural rule must yield to the superior constitutional right. *Whitmore*, supra, at 898. *Whitmore*, supra, finally decided in 1978, was a capital murder case where the death penalty was imposed. The indictment charged Whitmore with causing the death of Judy Carol Rummel by employing Harrell Totty for remuneration to kill her. Totty was also indicted. A severance was granted and Whitmore was tried first though he had asked that Totty be tried first. Following conviction Whitmore's first motion for new trial was overruled. Totty was then tried and acquitted by a jury. Whitmore filed a second untimely motion for new trial alleging newly discovered evidence in the form of Totty's testimony which had just become available to him because prior to the acquittal Totty would have asserted his Fifth Amendment privilege against self-incrimination and refused to testify. The motion for new trial was overruled because it was not timely filed. See Article 40.05, V.A.C.C.P. (1965).

Apparently, however, a hearing on the said untimely motion for new trial was held. It was shown that Totty's attorney told Whitmore's counsel that Totty would assert his Fifth Amendment right and would not testify at Whitmore's trial. A transcript of Totty's testimony at his own trial was offered at the hearing. It was this testimony that apparently caused the jury to acquit Totty in his own trial.

In *Whitmore*, supra, the majority of the Court held that Totty's testimony which had been unavailable at Whitmore's trial due to Totty's privilege against self-incrimi-

nation but which testimony had become available after Totty's acquittal in another trial, and which testimony would probably bring about a different result at another trial of Whitmore was "newly available" evidence entitling Whitmore to a new trial. It was held that the fact that the statutorily allowed time for filing the motion for new trial had expired before Totty was acquitted did not preclude the defendant from obtaining a new trial on the basis of the "newly available" evidence, that a valid procedural rule must yield to a constitutional right. The Court also held that the hearing displayed "good cause" for late filing of the motion for new trial.

The reversal in *Whitmore*, supra, occurred in the opinion on the appellant's motion for rehearing. The State's motion for leave to file a motion for rehearing was then granted, but the Court enlarged by a constitutional amendment, split four to four on the said State's motion for rehearing with new Judge Jim Vollers disqualifying himself because of earlier participation in the cause while State's Attorney. The Governor then appointed Honorable Thomas M. Reavley as Special Judge in the cause. In a concurring opinion Judge Reavley agreed with four judges in overruling the State's motion for rehearing, and particularly noting the death penalty was involved. Needless to say, the Court was badly split. See also *Etter v. State*, 679 S.W.2d 511, 514 (Tex.Cr.App.1984).

It should be borne in mind that when *Whitmore* was decided the trial court retained jurisdiction of the cause until the appellate record was actually filed in the Court of Criminal Appeals. Under the provisions of Article 40.05, supra, then in effect, the trial court could "for good cause shown" extend the time for filing a motion for new trial, and further, under Article 40.09, § 12, V.A.C.C.P., performed an "appellate function" and decided whether to grant a new trial after the filing in the trial of the appellate briefs setting forth the grounds of error to be urged on appeal. And in *Whitmore* though the second motion for new trial was untimely filed, the trial court conducted a hearing thereon be-

fore concluding it should be overruled because it had not been timely filed. In passing the majority noted the facts developed at that hearing showed good cause for the late filing of the motion for new trial.

Even under *Whitmore* the mere listing or mention of constitutional rights is not sufficient, for constitutional rights may be waived like other rights. See *Borgen v. State*, 672 S.W.2d 456, 460 (Tex.Cr.App. 1984). There must be allegations showing the conflict between the statute or valid procedural rule and the constitutional rights involved, that to apply the statute would deprive the accused of a right secured by the Constitution. See *Morales v. State*, 587 S.W.2d 418, 421 (Tex.Cr.App. 1979). Good reason must be shown to permit the untimely filing of such motion. *Chanslor v. State*, 669 S.W.2d 786, 789 (Tex.App.-Houston [1st Dist.] 1984) rev'd on other grounds, 697 S.W.2d 393 (Tex.Cr. App.1985).

Appellant claims, inter alia, there is now "newly available" testimony as codefendant Puralewski's testimony was not available at appellant's trial because it was protected by Puralewski's Fifth Amendment privilege against self-incrimination which was superior to his own constitutional right to compulsory process. *Whitmore*, supra, at p. 897. The difficulty is that the record does not support this assertion. There is no showing that appellant requested an attachment, bench warrant, subpoena or other form of process for Puralewski and was denied such request. We do not understand appellant to claim otherwise. In fact, appellant did not attempt to call Puralewski as a witness. Further, the privilege against self-incrimination is personal to the witness and can be asserted only by him. *Etter v. State*, 679 S.W.2d 511, 515 (Tex.Cr. App.1984), and cases there cited. Not even the witness' attorney may claim the privilege for him. *Etter*, supra. There is no showing that Puralewski ever personally claimed his privilege against self-incrimination so as to defeat appellant's constitutional right to compulsory process for obtaining witnesses in his favor which is not an absolute right. *Weaver v. State*, 657 S.W. 2d 148, 150 (Tex.Cr.App.1983); *Spencer v. State*, 503 S.W.2d 557 (Tex.Cr.App.1974); *United States v. Wilson*, 732 F.2d 404 (5th Cir.1984).[11]

A defendant cannot normally complain that he was deprived of a constitutional right, such as compulsory process of witnesses, which he did not attempt to exercise and in fact waived, or assert it was blocked by the superior constitutional right of a codefendant, such as the privilege against self-incrimination which the codefendant never personally claimed.

Apparently recognizing the weakness of his position on these constitutional rights, he also claimed he was deprived of "confrontation." Puralewski, however, was not a witness against appellant, thus he was not denied the right of confrontation or the right of cross-examination. In fact, appellant refers to Puralewski as a "defense witness." Appellant also lists or mentions "cruel and unusual punishment" and "due process of law," but does not explain just how these constitutional rights should cause a valid procedural rule to yield.

■ Further, and most important, the claimed deprivation of constitutional rights, federal or state, cannot confer jurisdiction upon a court where none exists anymore than parties can by agreement confer jurisdiction upon a court. *Garcia v. Dial*, 596 S.W.2d 524, 527 (Tex.Cr.App.1980).

Even if it could be argued that the motion was timely filed, and the court had jurisdiction, can it be said that the trial court abused its discretion in denying such motion based on "newly available" evidence?

Motions for new trials on grounds of newly discovered evidence are not favored by the courts and are viewed with great caution. *United States v. Vergara*, 714 F.2d 21, 22 (5th Cir.1983); *United States v.*

---

11. "The criminal defendant's right to compulsory process is not absolute and the Constitution does not grant the right to subpoena any and all witnesses a party might wish to call. *Ross v.* *Estelle*, 694 F.2d 1008 (5th Cir.1983). The matter is addressed to the trial court's discretion. *United States v. Nixon*, 418 U.S. 683, 94 S.Ct. 3090, 41 L.Ed.2d 1039 (1974)."

*Martino*, 648 F.2d 367, 407 (5th Cir.1981), cert. den. 456 U.S. 943, 102 S.Ct. 2007, 72 L.Ed.2d 465 (1982); Wharton's Criminal Procedure, Vol. 4, § 599, p. 177, and cases there cited; Tex.Jur.3d, Vol. 25, Criminal Law, § 3487, p. 357, *Coleman v. State*, 108 Tex.Cr.R. 323, 300 S.W. 59 (1927); *Deuran v. State*, 134 Tex.Cr.R. 433, 115 S.W.2d 945 (1938).

Generally, the discovery after trial of new evidence material to the defendant constitutes a ground for new trial. Article 40.03(6), V.A.C.C.P.[12]

■ The requirements for obtaining a new trial upon newly discovered or "newly available" evidence are:

1. The newly discovered evidence was unknown to the movant at the time of his trial;
2. The movant's failure to discover the evidence was not due to his want of diligence.
3. The materiality of the evidence is such as would probably bring about a different result in another trial; and
4. The evidence is admissible, and not merely cumulative, corroborative, collateral or impeaching.

See *Boyett v. State*, 692 S.W.2d 512, 516 (Tex.Cr.App.1985); *Etter v. State*, 679 S.W. 2d 511, 514 (Tex.Cr.App.1984); *Van Byrd v. State*, 605 S.W.2d 265 (Tex.Cr.App.1980); *Eddlemon v. State*, 591 S.W.2d 847 (Tex. Cr.App.1979); *Hernandez v. State*, 507 S.W.2d 209 (Tex.Cr.App.1974). See also *Whitmore*, supra.

■ In his untimely filed motion for new trial appellant alleged, inter alia, that new evidence had become available since the codefendant Puralewski, "a material witness for the defense, was unable to testify because of his Fifth Amendment rights"; that Puralewski had pleaded guilty and received a sixty year sentence

and the Fifth Amendment rights can no longer prevent the defense from obtaining his testimony; that the fact of the sixty year sentence itself would be an important factor as a new jury, with such knowledge, would be less likely to assess another death penalty; that Puralewski had now stated that he alone killed Jeffrey Mays and the appellant did not assist him.

Attached was an affidavit from Puralewski sworn to before Peter Fleury, a Notary Public, shown by the record to be a law clerk to appellant's attorney. In it Puralewski stated he alone committed the murder of Mays, and that while the appellant was present he did not aid in the commission of the offense, and that he did not rob, steal from or murder Jeffrey Mays. In the affidavit Puralewski acknowledged he had made earlier inconsistent statements before he received a sixty year sentence upon a plea of guilty, but he was "under considerable pressure ... afraid for my life. Also, I made the previous statements at a time when I had been denied medicine prescribed to me to control my epilepsy and my psychological inflictions. Therefore, I was not thinking clearly. Presently, I am in a better mental condition. I am able to think clearly...."

The State filed an "Opposition to the Out of Time Motion for New Trial" and attached Puralewski's previous statements including a 16 page handwritten one implicating appellant as the sole killer and exculpating himself.

As earlier noted the court set a date for a hearing on the belatedly filed motion, and on that date when the motion was called and appellant's counsel announced no witnesses were available because he thought the court was going to summarily overrule the motion. An argument as to the law was entertained. The motion was overruled without an evidentiary hearing.[13]

---

**12.** Article 40.03, V.A.C.C.P., reads in pertinent part:

"Grounds for New Trial in Felony
"New trials, in cases of felony, shall be granted the defendant for the following causes, and for no other:

\*    \*    \*    \*    \*    \*

"(6) Where new evidence *material* to the defendant has been discovered since the trial. A motion for a new trial on this ground shall be governed by the rules which regulate civil suits." (Emphasis supplied.)

**13.** On May 9, 1984, appellant filed in this Court a "Motion for Leave to File Original Application for Writ of Mandamus or Motion for Abatement

Examining the above listed requirements for a new trial based on newly discovered or "newly available" evidence, we observe that if Puralewski's testimony was true that although present, appellant did not participate in the murder, and did not rob and steal, then the matter of non-participation was certainly known to the appellant at the time of trial.[14] Unlike *Whitmore* the codefendant's potential testimony did not address relevant facts to which the appellant was not privy. See *Wilson v. State*, 633 S.W.2d 952 (Tex.App.-El Paso 1982); *Etter v. State*, supra.

In *Jacobs v. United States*, 475 F.2d 270, 286, n. 33 (2nd Cir.1973), cert. den. 414 U.S. 821, 94 S.Ct. 131, 38 L.Ed.2d 53 (1973), the Court stated:

"[A] Court must exercise great caution in considering evidence to be 'newly discovered' when it existed all along and was unavailable only because a co-defendant, since convicted, had availed himself of his privilege not to testify."

In *United States v. Metz*, 652 F.2d 478, 479 (5th Cir.1981), the Court wrote:

"Even if Schiller [co-defendant] may have been unavailable to testify at their joint trial because he invoked the Fifth Amendment, Metz himself was not precluded from testifying in his own behalf that he (i) knew nothing of the conspiracy (ii) was unaware of the presence of cocaine in his residence, and (iii) was not at his residence on December 14, 1977 at time of Schiller's visits."

And in the instant case the appellant did not choose to personally present his defensive theory to the jury. See *United States v. Metz*, 652 F.2d 478, 480 (5th Cir.1981).

The privilege against self-incrimination is personal to the witness and can be asserted only by him. *Etter v. State*, 679 S.W.2d 511, 515 (Tex.Cr.App.1984), and cases there cited; *Dunn v. State*, 696 S.W.2d 561, 567 (Tex.Cr.App.1985). Not even the witness' attorney may claim the privilege for him. *Etter*, supra, at 515; 8 Wigmore, Evidence, § 2272 at 42 (McNaughton rev. 1961). The record does not reflect that Puralewski was called out of the jury's presence,[15] by compulsory process or otherwise, to determine if he would claim the privilege against self-incrimination if called as a witness for the defense or would waive the same.[16] Further, no motion for severance was filed requesting that Puralewski be tried first so that he would be available as a witness at appellant's trial.

In *Etter*, supra, it was held that a defendant convicted of murder was not entitled to a new trial based on "newly available" testimony of codefendant who did not testify at the trial on the merits and who was acquitted after the joint trial in that the defendant filed no motion for severance seeking to having codefendant tried first so that he would be available as a witness at his trial and the codefendant did not personally claim his privilege against self-incrimination nor was any attempt made to show that he was not testifying because of the privilege so that the diligence requirement was not met.

By virtue of so-called written "bills of exception" filed after the overruling without evidentiary hearing of the out-of-time motion for new trial and refused by the trial court, the appellant sought to establish what testimony would have been offered at the hearing if it had been permitted and his witnesses had been available. In these "bills" appellant sought to show his counsel's awareness prior to trial of

---

and Request for Hearing." It was denied on May 15, 1984.

**14.** A new trial is never allowed for the purpose of obtaining evidence that was known and accessible to the defendant at the time the cause was tried, "and this is true although the defendant had knowledge of the evidence but failed to communicate it to his attorney." Tex.Jur.3d, Vol. 25, Crim.Law, § 3488, pp. 359–360.

**15.** It is established that a defendant may not call a witness in the presence of the jury knowing that he will invoke the Fifth Amendment, see *Whitmore*, supra, at p. 896.

**16.** It has been held that a defendant is not entitled to a new trial on the ground of newly discovered evidence where the evidence was that of which he was aware but failed to obtain by subpoena. *McClure v. State*, 648 S.W.2d 667 (Tex.Cr.App.1982), cert. den. 464 U.S. 841, 104 S.Ct. 136, 78 L.Ed.2d 129.

Puralewski's statements implicating him and exculpating Puralewski, and that trial counsel had a pretrial conversation with Puralewski's attorney indicating that Puralewski would assert the Fifth Amendment if called. This, appellant asserts, excuses any lack of due diligence.[17] Even if the "bills" were properly before this Court,[18] and even if the evidence was unknown to the appellant, or was unavailable to him at the trial, and that failure to obtain the evidence was not due to a lack of diligence and that he moved promptly once Puralewski's statement after his own conviction was obtained, a question of materiality remains. The "newly available" testimony would have to be material in the sense that it is "probably true and of such weight as to probably produce a different result at another trial." *Etter*, supra, at 513; *Van Byrd,* supra.

It is not unusual for one of two convicted accomplices to assume the entire fault and thus exculpate his codefendant by the filing of a recanting affidavit or other statement. It should go without saying that not every recanting or other statement requires a new trial of the other defendant for whose benefit it is produced. See *United States v. Metz,* 652 F.2d 478, 480 (5th Cir.1981), quoting *Ledet v. United States,* 297 F.2d 737, 739 (5th Cir.1962). See also *Ochoa v. State,* 653 S.W.2d 368 (Tex.App.-San Antonio 1983). Further, in *Metz,* supra, at 480–481, the Court noted that it had recognized that a trial judge may consider whether the testimony of a codefendant is

"contrary to his penal interest" citing *United States v. Alejandero,* 527 F.2d 423, 428 (5th Cir.), cert. den. 429 U.S. 844, 97 S.Ct. 124, 50 L.Ed.2d 115 (1976). In *Alejandero,* supra, the codefendant had been "caught red-handed" and the Court wrote: "His effort to absolve his co-defendant cost him nothing. It is not usual under these circumstances for the obviously guilty defendant to try to assume the entire guilt."

In such situations recanting affidavits, other statements and witnesses are viewed with extreme suspicion by the courts. *United States v. Adi,* 759 F.2d 404 (5th Cir.1985).

In the instant case we have a comparable situation. Puralewski, who pleaded guilty and received 60 years as punishment has nothing to lose by now exculpating the appellant Drew.[19]

In his statement sworn to before the law clerk of appellant's counsel, Puralewski states that appellant did not participate in the murder at all and "did not rob or steal." Such is totally inconsistent with the bulk of the trial testimony heard by the trial judge. Puralewski also recants his previous statements given which implicate the appellant in the murder and which are generally consistent with the trial testimony. He recognized these statements are inconsistent with his present statement, but he says without stating facts that he was under "considerable pressure," denied medicine to control his epilepsy and his "psychological; inflictions," but that he is now "in a better mental condition," etc.

17. Tex.Jur.3d, Vol. 25, Criminal Law, § 3490, pp. 370–371, reads:
    "Due diligence requires that a defendant cause subpoenas to issue for witnesses whom he knows to be conversant with the facts. If he fails to summon witnesses, a new trial on the ground that the evidence is newly discovered will be denied. Thus, a new trial will not be granted in order to obtain the attendance of persons whom the defendant knew had witnessed the occurence on which the charge is based, and who could have been required to attend the trial had the requisite diligence been used. Likewise, the court usually will refuse to grant a new trial in order to admit the testimony of a witness who claims to have been with the defendant at the time of the commission of the alleged crime.

    "It is no excuse for the failure to issue a subpoena that the defendant relied on the witness' promise to attend, that he thought that the witness' testimony would be unfavorable, or that he was informed by a third person that the witness would not be able to testify to material facts."

18. The "bills of exceptions" do not comply with Article 40.09, § 6, V.A.C.C.P., then in effect, as reflecting some "action occurrence, etc." not otherwise reflected in the appellate record, but was an attempt to show testimony which had not been offered or permitted.

19. Puralewski entered a guilty plea to murder after the State had waived and abandoned two counts of capital murder and another count of murder.

If everything the appellant has filed and even claims to be true is considered, can it *be said the materiality requirement has been met? Is it true and of such weight as to probably produce different results at another trial?* See *Ochoa,* supra; *Etter,* supra. Should it appear to the trial court that under the circumstances of the particular case, credibility or weight of the newly discovered evidence is not such as would probably bring about different results upon a new trial the matter of a new trial is within the trial court's discretion. *Jones v. State,* 711 S.W.2d 35 (Tex.Cr.App.1986), and in absence of a clear abuse of discretion a ruling denying such motion will not be disturbed on appeal.[20] See generally, 25 Tex.Jur.3d, Criminal Law, § 3570, p. 508.

In *United States v. Vergara,* 714 F.2d 21, 23 (5th Cir.1983), the Court wrote:

"More recently, in *United States v. Metz,* 652 F.2d 478 (5th Cir.1981), we had occasion to reject contentions similar to those now advanced—that a previously silent accomplice's willingness after conviction to exculpate his convicted co-conspirator is newly discovered evidence entitling the latter to a new trial. We noted that, subject to review for abuse of discretion only, the district court may deny the new trial, *even without an evidentiary hearing,* on its assessment that the belated exculpation is not credible or would not be sufficient to produce a different result at a new trial. *Metz,* 652 F.2d at 481." (Emphasis supplied.)

New trial on such basis "should be granted only with great caution." *Metz,* supra, at 479.

In the instant case the trial judge did not abuse his discretion in overruling the motion for new trial on the basis of "newly available" testimony. *Etter v. State,* 679 S.W.2d 511, 515 (Tex.Cr.App.1984); *Ayers v. State,* 606 S.W.2d 936, 941 (Tex.Cr.App.

1980). Tex.Jur.3d, Vol. 25, Criminal Law, § 3570, p. 508.

All of appellant's contentions on the out-of-time motion for new trial are overruled.

The judgment is affirmed.

CLINTON, J., being unwilling to undermine *Whitmore,* joins only the judgment of the Court.

TEAGUE, J., concurs.

---

**20.** While many cases cited for this proposition involve cases where there has been a hearing on the motion for new trial, e.g., *McCartney v. State,* 542 S.W.2d 156, 162 (Tex.Cr.App.1976); *Appleman v. State,* 531 S.W.2d 806 (Tex.Cr.App. 1976); *Beal v. State,* 520 S.W.2d 907 (Tex.Cr. App.1975), it is not so limited. It is applicable where the court denies the motion without an evidentiary hearing. See *Menjares v. State,* 456 S.W.2d 946 (Tex.Cr.App.1970); *Cooper v. State,* 146 Tex.Cr.R. 449, 176 S.W.2d 190 (1943); *Benavides v. State,* 17 S.W.2d 1068 (Tex.Cr.App.1929); *Ross v. State,* 100 Tex.Cr.R. 295, 273 S.W. 582 (Tex.Cr.App.1925). See also *United States v. Johnson,* 596 F.2d 147 (5th Cir.1979).