

NUMBER 13-12-00272-CR

COURT OF APPEALS

THIRTEENTH DISTRICT OF TEXAS

CORPUS CHRISTI − EDINBURG

FAUSTINO OVALLE,                                                    Appellant,

v.

THE STATE OF TEXAS,                                                  Appellee.

On appeal from the 36th District Court
of San Patricio County, Texas.

## MEMORANDUM OPINION

**Before Chief Justice Valdez and Justices Rodriguez and Garza
Memorandum Opinion by Chief Justice Valdez**

A jury convicted appellant, Faustino Ovalle, of four counts of aggravated assault, and the trial court sentenced him to thirty-five years' confinement. *See* Tex. Penal Code Ann. § 22.02(a) (West 2011). By eight issues, appellant contends that: (1) the State violated his Sixth Amendment rights by allegedly "taking" his legal documents and thus infringing upon his attorney-client relationship; (2) the evidence was insufficient to

show that appellant exhibited or used a firearm; (3) a witness "intentionally withheld exculpatory testimony by telling defense counsel he would invoke a [F]ifth [A]mendment privilege"; (4) the trial court erroneously denied appellant's motion for new trial when the prosecutor made an improper jury argument; (5) the trial court failed to replace a juror who was biased; (6) a notation on the docket sheet shows that the jurors separated and discussed the case; (7) "[t]he fingerprint expert offered no more than his ipse dixit concerning [the] identity of [appellant] . . . in a previous conviction used to enhance punishment"; and (8) trial counsel rendered ineffective assistance of counsel "for failing to challenge the fingerprint expert's methodology, failing to state an objection to [the biased juror] continuing to participate, and by failing to make [the witness] invoke the [F]ifth [A]mendment on the record." We affirm.

## I. BACKGROUND

Appellant, John Gabriel Guzman, and Michael Ruiz were at Raymond Pereida's house. Javier Martinez, Jaime Martinez, Steve Martinez, and Oscar Martinez went to Pereida's house. Javier testified that Jaime attempted to touch a set of golf clubs, and appellant told Jaime to stay away from the clubs. Eventually, Jaime and appellant began arguing over the golf clubs. Jaime testified that he heard appellant say that he had a gun "behind his back pants" and saw appellant move toward Javier. Jaime claimed he then punched appellant to protect Javier. Jaime and appellant wrestled on the ground. According to Jaime, the men stopped wrestling, and they shook hands. Jaime stated that when he backed away, he heard appellant ask Ruiz to give him the gun. Oscar also testified that he heard appellant ask Ruiz, "Where is the gun? Where is the gun?" Oscar saw appellant reach behind Ruiz and get a gun.

2

Jaime testified that he then ran to the truck. Jaime saw Guzman "[take] off running," and Guzman did not get into the truck. Oscar, Jaime, Steve, and Javier got into the truck. Oscar stated that while in the truck, he told appellant, "Don't shoot. Don't shoot. I'm in here." Oscar later clarified that, when he asked him not to shoot, appellant was pointing the gun at Steve. According to Oscar, at this point, appellant went to the passenger side of the truck and began hitting Jaime with his gun. Oscar explained that when appellant hit Jaime with the gun on the head, Jaime "was like knocked out at the time," so Steve put his arms around him to protect Jaime from further blows. Oscar stated that appellant hit Jaime with the part of the gun "where the clip is at at the bottom of the gun." Jaime testified that appellant hit him approximately five to seven times on the head and that he experienced physical pain as a result of the blows.[1] Jaime heard Oscar say, "He's shooting at us. He's shooting at us."

Steve testified that, after he went to the truck, he saw appellant with "a weapon" he described as a handgun. Steve said that appellant was pointing a handgun at "everybody inside the truck." Steve stated that appellant then approached the passenger side of the truck and began hitting Jaime with "whatever he had in his hand." Steve testified that he attempted to shield Jaime from the blows, and felt something hit his arm. Steve started the truck and backed it up. Steve lowered the radio and heard "a bang" and "the guys" telling him to "go, go." Although he initially denied being afraid to testify, Steve admitted that before testifying, he had told the prosecutor that he was afraid to testify. Steve said, "Well, I mean, I'm afraid because of my son."

---

[1] Jaime stated that he visited a doctor the next day and discovered that he suffered a concussion.

3

Javier testified that while appellant and Jaime wrestled on the ground, he turned away, "felt a hit" and saw Ruiz "coming" at him. Javier stated that Ruiz hit him, and he lost his glasses. Javier believed that he heard appellant tell Ruiz, "Give me something" or "Give me a gun." Javier saw appellant approach the passenger side of the truck and hit Jaime in the back of his head with "something" that could have been his hand or his fist. Javier testified that he could not see very well without his glasses. Guzman testified that he saw appellant hitting Jaime with the back side of the gun.

Javier stated that Steve started the vehicle and reversed it to leave the scene. Javier testified that "Oscar was saying I think he's shooting at us, or something like that." Javier did not see appellant shooting the gun; however, he heard a couple of the shots. Javier heard Oscar yell, "I think he's shooting at us." Javier acknowledged that he told police officers that he saw a gun; however, he could not recall making that statement. Javier admitted that he was afraid to testify.

Javier and Jaime testified that Jaime called 911. Jaime recalled telling the dispatcher that appellant "had been shooting at us and he had hit me and we had gotten in a fight." Jaime did not recall telling the dispatcher that appellant had a gun. No gun was recovered. But the police found one shell casing consistent with special cartridges found in appellant's room. When asked if he was scared to testify, Jaime replied, "I've been scared."

Oscar testified that he knows appellant by the nickname, "Tino." Oscar stated that he saw appellant with a handgun, but he did not know what kind of gun it was. Oscar witnessed appellant hitting Jaime on the right side of his head. Oscar heard gunshots but did not recall how many. Oscar testified that he did not look back because

4

he was afraid. When asked, "And who fired that gun," Oscar responded, "Tino." Oscar stated that while appellant was shooting at him, he "was just scared for one of us to get hit. I didn't know if it was going to hit one of us or not." When asked, "Well, what direction was the gun pointing at as you drove away," Oscar said, "Toward the truck. I don't know, like I said, if it was pointing at the truck or in the air to scare us off or something but there were shots fired." However, Oscar clarified that when he last saw appellant holding the gun, appellant was pointing the gun at the truck. On redirect examination by the State, Oscar testified that he saw appellant pointing the gun at the truck, heard the gunshot, and then Javier immediately covered Oscar with his hands. The prosecutor asked Oscar if he knew whether the object appellant held was a gun, and Oscar said, "Yes, ma'am." Oscar described it as a "handgun."

Guzman testified that he was not in the truck when he witnessed appellant shoot the gun at the truck as the men attempted to flee. Guzman stated that appellant pointed the gun at the truck and shot the gun approximately four times. Guzman did not know what type of gun appellant had. Guzman ran away from the scene.

Rosie Maldonado, a communications officer with the San Patricio County Sheriff's Office, testified that she answered a 911 call from a person identifying himself as Jaime Martinez. The trial court admitted a recording of the 911 call, and it was played for the jury. On the tape, Jaime stated, "We've been shot. We've been—we've been shot at." When Officer Maldonado asked for the men's location, Jaime stated, "He—he shot at us." When asked if anyone was hurt, Jaime replied that the assailant had hit him on the head with a gun. Jaime reported that the assailant's name was "Tino Ovalle."

5

Lieutenant Eric Blanchard testified that he acquired a video taken from a surveillance camera on the night of the shooting. The prosecutor asked Lieutenant Blanchard to "point to the muzzle flashes." While viewing the video, Lieutenant Blanchard stated that the viewers would see the truck "drive at a fast pace" and then "the flashes where the vehicle is coming from and observe two flashes. There is the vehicle; one, two."[2] On cross-examination, Lieutenant Blanchard acknowledged that he could not say "for sure" what the flashes actually were, but that in his opinion, "the flashes were consistent with being muzzle flash from a firearm." Lieutenant Blanchard stated, "I watched the video for other explanations, but the only explanation I have for those flashes and the vehicles speeding away is consistent with the statements that we had at the time of the investigation." Lieutenant Blanchard testified that a firearm is a deadly weapon and that a handgun is considered a firearm. According to Lieutenant Blanchard, Steve was uncooperative and told him he did not want to testify because "[h]e was scared."

Casey Allen, a firearms and toolmark examiner with the Texas Department of Public Safety Crime Laboratory, examined a "jacket" found at the scene of the shooting. Allen stated that she examined the "jacket" to determine its caliber and a possible firearm. Allen explained:

> It was determined that this item is consistent with a copper jacket from a .38 caliber class projectile having been fired from a firearm with conventional rifling with six lands and grooves inclined to the right. A list of possible firearms from which it could have been fired was too numerous to actually list.

---

[2] The prosecutor offered the video as showing "gun flashes, not shots."

Allen clarified that she could not match the jacket to a firearm in this case because no firearm had been submitted. Allen stated that "[most] firearms that fall within the .38 caliber class are primarily handguns" including, among others, ".380 auto, 9 mm Ruger, .28 Smith & Wesson, .38 Special, .357 Magnum . . . ."

In Allen's opinion, the jacket "mostly likely was a hollow point projectile." Allen testified that when a revolver type firearm has been used, one would not expect to find jackets ejected at the scene. Allen said that "[b]ased on the appearance of the jacket, it had to have been fired through a firearm at some point," which is a deadly weapon. The prosecutor showed Allen State's Exhibit No. 21, a box of .38 caliber special cartridges, found in the home where appellant was staying. The prosecutor asked if those cartridges would "be consistent with the jacket that [she] examined" and found at the scene; Allen responded, "Yes, ma'am. The jacket could come from a cartridge like this."

The jury convicted appellant of aggravated assault, and appellant received a thirty-five year sentence. Appellant filed a motion for new trial, and a hearing was held. The trial court denied appellant's motion. This appeal ensued.

## II.    SIXTH AMENDMENT VIOLATION

By his first issue, appellant contends that the trial court should have dismissed the charges against him because the State committed a "deliberate invasion of the attorney-client privilege."

### A.    Pertinent Facts

While he was incarcerated awaiting trial, several officers entered appellant's cell and took a storage bin from his cell. Appellant filed a motion to dismiss claiming that his "Sixth Amendment right to confidential attorney-client communication, to assist his

7

attorney in preparing for trial without interference from the state and to a fair trial may have been compromised when his legal material with the notes on his defense strategy were taken." Appellant argued at the hearing that when the officers conducted the search of his cell, the officers failed to follow state jail procedure by not opening certain documents in front of him. According to appellant, the legal material was returned to him the same day, and the record supports this.[3]

The trial court held a hearing on appellant's motion to dismiss. At the hearing, San Patricio County Sheriff's Department Investigator Isaac Leal testified that he searched a storage bin that had been taken by jail officers from appellant's cell to investigate allegations that threats had been made against witnesses in appellant's case. Investigator Leal stated that he searched the contents of appellant's storage bin for contraband and gang paraphernalia.

Investigator Leal testified that he "did not look at any letters that were labeled on letterhead or anything that said legal mail." Investigator Leal stated that he did not open any "legal mail." Investigator Leal acknowledged that he "went through some legal mail" that was contained in open envelopes. However, when asked, Investigator Leal denied reading the letters. Moreover, on cross-examination by the State, Investigator Leal testified that he did not read and does not remember the contents of the documents labeled "legal mail." Investigator Leal recalled that appellant's storage bin contained some handwritten notes that he reviewed. Investigator Leal agreed with appellant's trial attorney that he read appellant's handwritten notes. However, Investigator Leal did not remember "seeing any correspondence" from appellant's trial attorney.

---

[3] According to appellant, the search and confiscation occurred at "around 1:30 a.m.," and the material was returned to him at "around noon that same day."

Investigator Leal explained that in his experience as a "gang expert," individuals "use legal mail to hide messages or threats or other contraband." However, those items he searched belonging to appellant were not marked "legal mail." Investigator Leal seized contraband from appellant's bin. Investigator Leal testified that no one reviewed anything that was marked "legal mail." Investigator Leal did not recall any of the materials being addressed to appellant's trial counsel. Evidence was presented that jail standards require the acquisition of a warrant to examine outgoing mail and that incoming mail has to be opened in the presence of the inmate.

Retha Cable, an assistant district attorney, testified that she participated in the search of appellant's cell "based on the threats information [they] received from the witnesses and victims in this case." Cable stated that she conferred with officials from the jail and co-counsel because they were aware that appellant is a "documented member of the Mexican Mafia," who "while they are incarcerated, will use individuals on the outside to carry out their business." Cable testified that she did not "look at any attorney/client mail" and did not remember "anything specifically marked legal mail or anything addressed to [trial counsel] or anything that had legal mail written on it at all." Cable stated that no legal mail was read by anyone when they searched appellant's cell. She stated nothing would be used against appellant at trial. Cable said, "I have no personal knowledge, and neither does the State, of any legal concepts or anything that you and your client may have discussed." Cable reiterated that "there was nothing in [appellant's] bin" labeled "legal mail or legal."

At the hearing, appellant claimed that the State took legal material contained in a manila envelope and "one regular envelope" from his cell. The trial court admitted

9

Defendant's Exhibit 2, a picture of an envelope addressed to appellant from his attorney, with the notation "legal mail" written in handwriting on the outside. Appellant stated that Defendant's Exhibit 2 contained some correspondence from his trial attorney and some "notes of strategy" that he was compiling to send to his trial attorney. The trial court also admitted Defense Exhibit 3, which are handwritten notes with the phrase "Inconsistencies and contradictions statements" written on the top.

On cross-examination by the State, appellant acknowledged that the notes admitted as Defense Exhibit 3 were not addressed to his attorney, did not "say legal," and that specifically the notes said, "inconsistent and contradictory statements." Appellant testified that the manila envelope had a sticker from the district attorney's office addressed to appellant's trial attorney and contained police reports and offense reports. Appellant stated that the manila envelope also contained legal correspondence between him and his attorney.

On re-cross examination, appellant agreed with the prosecutor that the items contained in the manila envelope were discovery items that were provided by the State to appellant's trial attorney. Appellant testified that there were no other documents in the envelope marked "legal mail" and the manila envelope other than the items provided through discovery by the State to his trial attorney and the above-mentioned "notes" of "inconsistent and contradictory statements."

The trial court denied appellant's motion to dismiss. The trial court stated that he found that "there was no violation of the state jail standards [because the material examined] was not outgoing mail, it wasn't in an envelope, it wasn't addressed [to trial counsel] . . . It was something [appellant] was maintaining in his cell."

10

Subsequently, the trial court issued findings of fact and conclusions of law. The trial court found in pertinent part that: (1) "The property seized and searched included privileged legal communications and Sixth amendment materials"; (2) "Neither [appellant] nor his attorney, were present during the search of the contents of the defendant's cell"; (3) "The evidence introduced by testimony and affidavit established that neither the investigators nor the prosecutors actually read the contents of any legal documents that may have been included [in] the defendant's property"; (4) no specific jail policy was violated; and (5) "None of the legal materials contained in the defendant's property was outgoing mail." The trial court's conclusions of law were as follows: (1) "The access to legal communication by law enforcement alone does not rise to the level of violation of the defendant's [S]ixth [A]mendment" rights; (2) "The defendant must produce proof of the violation of [S]ixth [A]mendment" rights; (3) "The defendant produced no proof of a violation of his [S]ixth [A]mendment" rights; and (4) "The defendant's [S]ixth [A]mendment [rights were] not violated by law enforcement conducting a search of his cell and property box for contraband."

**B. Applicable Law**

Dismissal of an indictment is "a drastic measure only to be used in the most extraordinary circumstances." *State v. Mungia*, 119 S.W.3d 814, 817 (Tex. Crim. App. 2003). A trial court may not dismiss an indictment with prejudice without the prosecutor's consent except in certain circumstances where the court is authorized by constitution, statute, or common law. *State v. Johnson*, 821 S.W.2d 609, 612 (Tex. Crim. App. 1991). Dismissal may be warranted when a defendant suffers demonstrable prejudice, or a substantial threat thereof, and where the trial court is unable to "identify

11

and neutralize the taint" by other means. *State v. Frye*, 897 S.W.2d 324, 330 (Tex. Crim. App. 1995). "If a state agent interferes with confidential attorney-client communications, not only is there a risk of disclosure of confidential information but also such an intrusion chills free discussion between a defendant and his attorney." *Woodruff v. State*, 330 S.W.3d 709, 724 (Tex. App.—Texarkana 2010, pet. ref'd).

## C. Analysis

Here, the trial court heard evidence that no one read any legal mail. Regarding the notes, appellant admitted that they were not marked legal mail and that they were not addressed to his trial attorney. Therefore, we cannot conclude that in this case, appellant's Sixth Amendment right to counsel was violated. Moreover, "'absent demonstrable prejudice, or substantial threat thereof, dismissal of the indictment is plainly inappropriate.'" *Woodruff*, 330 S.W.3d at 723 (quoting *United States v. Morrison*, 449 U.S. 361, 365 (1981)). Here, there is no demonstrable prejudice because the State prosecutor testified that nothing contained in the materials would be used against appellant during his trial and appellant does not complain that any privileged or confidential attorney-client evidence contained in his notes was admitted at trial.[4] We overrule appellant's first issue.

## III. SUFFICIENCY OF THE EVIDENCE THAT APPELLANT EXHIBITED OR USED A FIREARM

By his second issue, appellant contends that there is no evidence in the record that he used or exhibited a firearm because none of the witnesses testified "with any specificity that the object used by appellant was a firearm." Instead, appellant

---

[4] Appellant complains that the State somehow improperly used his note that he did not have gun residue on his hands when tested after the shooting occurred. We find this complaint without merit. The State would have been aware of this fact before reading his notes because the State's witness Lieutenant Blanchard testified on cross-examination by appellant's trial attorney that he had conducted a gun residue test on appellant that was negative. Moreover, the evidence was exculpatory.

12

complains, the witnesses merely testified that he had a handgun and no one knew what kind of handgun it was.

Appellant argues that none of the witnesses testified that the handgun he used was in fact a firearm as defined by the penal code. The penal code defines firearm as any device designed, made, or adapted to expel a projectile through a barrel by using the energy generated by an explosion or burning substance or any device readily convertible to that use. TEX. PENAL CODE ANN. § 46.04 (West 2011). Appellant appears to take issue with the fact that none of the witnesses said that the handgun was not a "hand bb gun" or other nonlethal weapon.

Although courts have found that the term "gun" may be a much broader term than "firearm" and may include such nonlethal instruments such as BB guns, blow guns, pop guns, and grease guns, *see O'Briant v. State*, 556 S.W.2d 333, 336 (Tex. Crim. App. 1977), it is within the fact-finder's province to draw reasonable inferences and make reasonable deductions from the evidence presented. *Cruz v. State*, 238 S.W.3d 381, 388 (Tex. App.—Houston [1st Dist.] 2006, pet. ref'd) (citing *Goodin v. State*, 750 S.W.2d 857, 859 (Tex. App.—Corpus Christi 1988, pet. ref'd)). "Absent any specific indication to the contrary at trial, the jury should be able to make the reasonable inference, from the victim's testimony that the 'gun' was used in the commission of a crime, was, in fact, a firearm." *Id.* (citing *Wright v. State*, 591 S.W.2d 458 (Tex. Crim. App. 1979); *Joseph v. State*, 681 S.W.2d 738, 739 (Tex. App.—Houston [14th Dist.] 1984, no pet.); *Riddick v. State*, 624 S.W.2d 709, 711 (Tex. App.—Houston [14th Dist.] 1981, no pet.)). Moreover, courts have held that the defendant's use of the object to

threaten the victim suggests that it is a firearm rather than a non-lethal object or BB gun. *Id.* at 389.

Here, there was evidence that after arguing and wrestling with Jaime, appellant asked for and acquired a handgun from Ruiz. Appellant pointed the gun at Steve, and Oscar asked him not to shoot. The men were in fear and fled in the truck at a high rate of speed. Appellant used the gun to beat Jaime on the head and caused him to suffer a concussion. While fleeing, Steve heard a bang, and Oscar stated that appellant was shooting at the men. Javier heard a couple of shots. Oscar heard gunshots and was afraid that the men would be hit by the bullets. Finally, Guzman testified that he witnessed appellant shoot the gun at the truck approximately four times. The jury also saw a video showing flashes appearing as the truck raced away. The flashes were described by Lieutenant Blanchard as being "muzzle flash from a firearm."

Viewing the evidence in the light most favorable to the jury's verdict, we conclude that the jury could have reasonably concluded, beyond a reasonable doubt, that appellant used or exhibited a deadly weapon, to wit, a firearm. *See* TEX. PENAL CODE ANN. § 46.01(3); *see also Brooks v. State*, 323 S.W.3d 893, 899 (Tex. Crim. App. 2010) (providing that we view the evidence in the light most favorable to the verdict to determine whether any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt when conducting a sufficiency review). We overrule appellant's second issue.

### IV.    MATERIAL WITNESS WITHHELD FROM APPELLANT'S TRIAL

By his third and fourth issues, appellant contends that the trial court should have granted his motion for new trial because "material evidence had been withheld during

14

trial, to-wit; a witness [Ruiz] who refused to testify at trial but later indicated a willingness to testify that [appellant] did not have a gun during the incident in question." According to appellant, this evidence was not available to him during the trial because the witness had informed defense counsel that he would invoke his Fifth Amendment right not to testify if called to the stand.

The denial of a motion for new trial lies within the discretion of the trial court. *Lewis v. State*, 911 S.W.2d 1, 7 (Tex. Crim. App. 1995). A defendant must be granted a new trial "when a material witness has been kept from court by force, threats, or fraud, or when evidence tending to establish the defendant's innocence has been intentionally destroyed or withheld, thus preventing its production at trial." TEX. R. APP. P. 21.3(e). The trial court may grant a new trial upon newly discovered or newly available evidence if: (1) the newly discovered evidence was unknown to the movant at the time of his trial; (2) the movant's failure to discover the evidence was not due to his want of diligence; (3) the materiality of the evidence is such as would probably bring about a different result in another trial; and (4) the evidence is admissible and not merely cumulative, corroborative, collateral, or impeaching. *Drew v. State*, 743 S.W.2d 207, 226 (Tex. Crim. App. 1987) (en banc).

The evidence shows that during appellant's trial, the State dismissed an indictment against Ruiz, and Ruiz did not testify. At the motion for new trial hearing, Ruiz testified that the reason he did not testify at appellant's trial was because he received legal advice that "if [he] had taken the stand someway, somehow there was still an indictment pending and if [he] would have taken the stand somehow that might

15

come back and charge [him] with another indictment." Ruiz stated that he was now willing to testify that appellant did not have a gun.

In *Drew*, the appellant was convicted of capital murder and sentenced to death. *Id.* at 209. After appellant's conviction, his co-defendant pleaded guilty to the crime and was sentenced to sixty years' confinement. *Id.* at 222. The co-defendant "executed a sworn statement in which he stated that he alone committed the murder of the deceased, and that while appellant was present, appellant did not participate." *Id.* The appellant in *Drew* filed a motion for new trial on the basis of newly available evidence. *Id.* The Texas Court of Criminal Appeals, in an en banc decision, held, among other things, that if the co-defendant's testimony was true, "then the matter of non-participation was certainly known to the appellant at the time trial." *Id.* at 227. The court explained that the co-defendant's "testimony did not address relevant facts to which the appellant was not privy." *Id.*

Here, Ruiz stated that he would have testified that appellant did not have a gun. Like the appellant in *Drew*, if true, the fact that appellant did not have a gun was known to appellant at the time of his trial. *See id.* Thus, Ruiz's testimony did not address relevant facts to which appellant was not privy. *See id.* We conclude that the trial court did not abuse its discretion in denying appellant's motion for new trial. We overrule appellant's third issue.

## V.    PROSECUTOR'S ALLEGEDLY PREJUDICIAL CLOSING ARGUMENT

By his fourth issue, appellant contends that the trial court should have granted a mistrial when during closing argument, the prosecutor stated that the witnesses were afraid to testify for fear of retaliation. Specifically, appellant argues that the prosecutor's

16

statement is not supported by the evidence. Appellant points to Javier's denial that he was afraid of retaliation, that Jaime stated "only that he's been scared and did not state the reason," that Steve "testified that he didn't want to testify, was afraid to be there, and was afraid for his son, but never said anything about retaliation," and that "neither Oscar Martinez nor John Gabriel Guzman said anything about fearing retaliation." Appellant further argues that the error is incurable because the prosecutor accused him of the extraneous offense of retaliation against a witness, which is a felony offense.

Counsel must confine his argument to the record, and it is improper for counsel to make any reference to facts that are not in evidence or that are not inferable from the evidence. *Alejandro v. State*, 493 S.W.2d 230, 231 (Tex. Crim. App. 1973); *see Allridge v. State*, 762 S.W.2d 146, 155 (Tex. Crim. App. 1988) (providing that it is error for counsel to interject facts not supported by the record in closing argument). Proper jury argument generally falls within one of four areas: (1) summation of the evidence; (2) reasonable deduction from the evidence; (3) answer to argument of opposing counsel; and (4) plea for law enforcement. *Id.* "The arguments that go beyond these areas too often place before the jury unsworn, and most times believable, testimony of the attorney." *Id.* However, when counsel commits such error, the error is not reversible, unless, in light of the record, the argument is extreme or manifestly improper. *Id.*

Here, both Javier and Jaime testified that they were afraid to testify. The evidence showed that appellant attacked Jaime and beat him on the head with a gun while Jaime attempted to flee from appellant. The evidence further showed that appellant fired several gun shots at a truck with several men inside. The only person that appellant argued with that day was Jaime; however, appellant shot at the truck

knowing that he could have killed any of the other men, with whom he had no quarrel. Steve first denied being afraid to testify, but then admitted that he had told the prosecutor that he was afraid to and did not want to testify. Steve stated that he was afraid to testify "because of [his] son" who had been in the truck and could have been killed when appellant shot his gun at them. Lieutenant Blanchard testified that Steve had been uncooperative and had told him he did not want to testify because he was scared. We conclude that it was reasonable for the prosecutor to deduce from the evidence presented that the reason the witnesses were afraid to testify was because they feared retaliation. *See id.* Thus, the trial court did not err in denying appellant's motion for mistrial. We overrule appellant's fourth issue.

## VI.    IMPROPER JUROR

By his fifth issue, appellant contends that the trial court erred by not removing a juror who allegedly "falsely stated in voir dire that he did not know appellant." Appellant argues that failure to remove Juror Garza from the jury constituted harmful error because "[i]nterjecting a person with bias against a defendant into deliberations cannot be said beyond a reasonable doubt to not have affected the finding of guilt."

### A.    Pertinent Facts

During general voir dire, the prosecutor asked the venire members whether any of them knew appellant. Hector Garza, a member of the venire, did not state that he knew appellant. Subsequently, during individual questioning by the prosecutor, when asked if he knew any of the witnesses mentioned, Garza replied that he did not. Neither the prosecutor nor appellant's trial attorney asked during individual questioning whether Garza knew appellant. Garza was chosen to serve as a juror in appellant's trial.

18

Subsequently, after each side closed its case-in-chief, but before the attorneys made their closing arguments, appellant's attorney asked that a witness be "shielded" from Garza "as much as possible" because the witness was "very afraid of him." Appellant's trial attorney explained that Garza was the witness's ex-boyfriend. The witness, Jessica, was also appellant's ex-girlfriend.

The trial court then stated that the prosecutor had informed the trial court that Garza, "a juror in this case[,] was here early this morning and had indicated to [the prosecutor] that he needed to talk to the Judge." Garza entered the courtroom and explained that he had received a phone call on the previous night at approximately 9:30 p.m. from a person named Sylvia Romero, who asked Garza if he was serving on jury duty "because I guess her ex-son-in-law was I guess the Defendant." Garza stated that he informed Sylvia that he "wasn't on jury duty just for the fact [that he] didn't want nobody to know," and he did not know whether he could get in trouble for telling her that he was serving on the jury. Garza knew Sylvia because she is the mother of his ex-girlfriend, Jessica. According to Garza, he and Jessica were together "in August of last year."[5] Garza stated that he did not have an "on-going relationship" with Jessica and that he had not spoken with her "since about September of last year."

The trial court asked, "Does that in any way affect your abilities to be a fair and impartial juror in this case," and Garza replied, "No, sir." Garza told the trial court that he did not discuss the case with Sylvia. The trial court asked whether Garza knew Sylvia's ex-son-in-law, and Garza said that he did not and had "never met him before in [his] life." The trial court clarified that Sylvia had been referring to appellant, and asked

---

[5] Garza later stated that it had been approximately seven months since he and Jessica had been together. Garza claimed that the relationship had lasted "about three weeks."

19

whether Garza knew appellant. Garza responded, "No, sir." The trial court asked, "Never met him," and Garza replied, "Besides Monday when we came in for jury duty, I mean, that's the first time I've ever heard his full name and first time I've ever seen him." The trial court then asked what Garza meant when he said that was the first time he had heard appellant's full name. Garza explained

> Like whenever I was with her daughter, her daughter would talk about—[Jessica's] little girl would talk about her dad some—by the name Tino but I know like ten different Tinos, so not indicating that it was him until [Sylvia] told me that last night that it was her ex-son-in-law. So I told her like, "Well, I ain't never met him and he ain't never met me so there shouldn't be a problem."

Garza stated that when he saw appellant he did not know who he was; that when he heard the name "Tino Ovalle" he did not know the last name; and at voir dire when that name was mentioned, it did not "ring a bell." The trial court asked Garza if his knowledge affected him in any way in deciding the case, Garza said, "No, sir." Garza stated that he had not developed any negative feelings toward appellant.

Appellant's trial attorney asked Garza if Jessica and Garza dated for five months, and Garza responded, "Negative, sir." Garza denied "knowing" of appellant and denied that he was "privy" to "any issues that Jessica may have had with the custody relationship of—that Tino had with her and her daughter." Garza stated that he did not know the last name Ovalle. Appellant's trial attorney asked if Garza recalled "saying that Tino was an A-hole," and Garza replied, "No." Garza denied having any "ill feelings toward Tino" and claimed that he currently had no "ill feelings toward him." Garza agreed that he did not "know anything" about Tino.

The trial court reviewed the transcript of the voir dire with appellant's trial attorney and stated that appellant had not indicated that he knew Garza during the voir dire.

20

Appellant's attorney replied, "That's correct, Your Honor . . . ." The trial court stated, "So your client doesn't know the juror. Why would he think that the juror would know him?" Appellant's trial attorney responded that he needed to present Jessica's testimony in order to demonstrate "that." The trial court allowed Jessica to testify.

Jessica stated that she had been in a relationship with Garza for "about three months" during the first week of August until "like the third week of October" of "last year." When asked if she ever spoke about "Tino" to Garza, Jessica said, "Yes. Well, he knew of him because [Garza] lived with me when we were dating . . . ." Jessica claimed that on one occasion, Garza called "Tino" an asshole "[b]ecause [they (Jessica and appellant)] had [had] a disagreement and I had told [Garza] about what had happened and that's what his reply was, 'He's such an asshole.'" Jessica agreed that this had been the only time that Garza had expressed an opinion about "Tino." When asked if she was afraid of Garza, Jessica said, "I'm not really afraid of him but he—when we did break up, he kind of went like haywire on me, so, yeah, I have to say 'Yes.'" Jessica stated that Garza did not assault her. Jessica stated that the last time that she had contact with Garza was "late October." Jessica acknowledged that Garza had never met appellant but claimed that the two men had been at her mother's house "at the same time" and that she had pictures of appellant in her home.

After Jessica left, the trial court reviewed with the attorneys what had occurred at voir dire regarding Garza. Appellant's trial attorney then informed the trial court that appellant did not recognize Garza during the voir dire. The trial court explained that the information was available to appellant and that he did not recognize Garza so how could appellant expect Garza to recognize him. The trial court stated, "I'm not inclined to

21

remove this juror at this point in time. I don't think we have sufficient grounds to do so in this particular matter."

## B. Discussion

Here, appellant complains that the trial court should have disqualified Garza as a juror due to bias. Bias of a juror against the defendant can in some cases be a basis for disqualification. *Anderson v. State*, 633 S.W.2d 851, 853 (Tex. Crim. App. 1982); *see* TEX. CODE CRIM. PROC. ANN. art. 33.011(b) (West Supp. 2013); *id.* art. 35.16 (West 2006). However, knowledge of a defendant alone, in and of itself, is not enough to show bias. *See Reyes v. State*, 30 S.W.3d 409, 411–12 (Tex. Crim. App. 2000) (explaining that a juror may become disabled and excused from jury duty if that juror has knowledge of the defendant that inhibits the juror from "fully and fairly" performing his functions as a juror). When a prospective juror admits resentment towards a defendant because of some prior contact, bias is shown as a matter of law. *Anderson*, 633 S.W.2d at 854. However, when bias is not shown as a matter of law, the trial court has discretion to determine whether the juror actually harbors any bias toward the defendant. *Id.* at 853–54. A "tangential acquaintance" does not amount to bias as a matter of law. *Id.* at 853.

Here, bias was not shown as a matter of law because Garza did not admit resentment towards appellant from some prior contact and denied having any "ill feelings" toward appellant. *See id.* at 854. Thus, it was within the trial court's discretion to determine that Garza did not have any bias against appellant. *See id.* at 853–54. We cannot say that the trial court abused its discretion merely because Garza denied

22

calling appellant an "asshole"[6], and denied knowing of appellant's relationship with Jessica prior to the trial. And, Garza stated that he could still be a fair and impartial juror in this case even now knowing about appellant's relationship with Jessica. We overrule appellant's fifth issue.

## VII.    JUROR MISCONDUCT

By his sixth issue, appellant argues that "a new trial should have been granted due to jurors separating during deliberations." Specifically, appellant complains that the trial court's docket sheet had a notation that "the jurors separated during deliberations and discussed the case while they were separated." Accordingly, appellant contends that the trial court should have granted his motion for new trial on that basis.

Appellant acknowledges that in this case, the trial court made a finding that the docket sheet entry was in error; however, appellant claims that "many of the trial court's other findings with respect to the motion for new trial are clearly erroneous." Appellant urges us to consider the docket sheet entry as evidence of juror misconduct because the trial court made so many factual errors during his trial. We decline to do so.

The record shows that at the motion for new trial hearing, the judge stated that: (1) he had made an error in the docket entry concerning the jury's discussion of the case during a "smoke break" outside the jury room; (2) he had instructed the jury not to discuss the case; and (3) appellant's trial counsel had investigated the matter and had found that the jurors had not, in fact, discussed the case while on break. Defense counsel stated, "I agree that none of the jurors I spoke to have indicated that any discussion took place so I do not have any witnesses and I have no other evidence I

---

[6] We acknowledge that conflicting evidence was presented that Garza had called appellant an "asshole." However, the trial court was in the best position to resolve such conflicts.

23

wish to bring in this matter." In his findings of fact, the judge found that he should have entered on the docket sheet: "Jurors did not discuss case either inside or outside jury room during break."

Appellant cites to no authority, and we find none, requiring reversal under these circumstances. There was no evidence establishing that the jurors committed any misconduct in this case. The evidence showed that the docket sheet entry was a mistake, and the trial court corrected it. Therefore, we cannot conclude that the trial court abused its discretion by denying appellant's motion for new trial on the basis of jury misconduct. We overrule appellant's sixth issue.

## VIII. PRIOR CONVICTION

By his seventh issue, appellant contends that it was not proven beyond a reasonable doubt that he had been previously convicted of another offense.

To establish that a defendant has been convicted of a prior offense, the State must prove beyond a reasonable doubt that (1) the prior conviction exists, and (2) the defendant is linked to that conviction. *Flowers v. State*, 220 S.W.3d 919, 921 (Tex. Crim. App. 2007). In proving these elements, the State may use "[a]ny type of evidence, documentary or testimonial." *Id.* at 922. The fact finder looks at the totality of the admitted evidence to determine whether there was a previous conviction and whether the defendant was the person convicted. *Id.* at 923.

In this case, the State used a fingerprint expert to prove that appellant had been previously convicted of another offense. Defense counsel objected to the admission of the pen packet on the basis that it was a copy and not an original certified document. The trial court overruled the objection. Appellant argues that the fingerprint expert's

24

opinion is unreliable because the expert did not adequately explain his methodology. Thus, according to appellant, it was not shown beyond a reasonable doubt that he had been convicted of the prior offense.

Appellant did not object to the fingerprint expert's qualifications or methodology during his trial. Thus, he may not make that argument on appeal. *See* TEX. R. APP. P. 33.1(a). Moreover, the Texas Court of Criminal Appeals has concluded that "fingerprint-comparison testimony is admissible under Texas Rule of Evidence 702 because it is reliable and it assists the trier of fact in its task of determining whether a latent fingerprint is that of a particular person." *Russeau v. State*, 171 S.W.3d 871, 886 (Tex. Crim. App. 2005).

The evidence was sufficient to establish beyond a reasonable doubt that the prior conviction existed and that appellant was linked to that conviction. [7] *See Flowers*, 220 S.W.3d at 921. We overrule appellant's seventh issue.

## IX. INEFFECTIVE ASSISTANCE OF COUNSEL

By his final issue, appellant contends that he received ineffective assistance of counsel because trial counsel failed to call Ruiz to the stand to invoke his Fifth Amendment privilege. *See Strickland v. Washington*, 466 U.S. 668, 687 (1984). Appellant argues that if we determine appellant waived his complaint concerning his trial counsel's failure to call Ruiz to testify and invoke his Fifth Amendment right, then we

---

[7] There was ample evidence, other than the fingerprint expert's testimony, establishing that appellant had committed the prior offense. Investigator Leal testified that he knew that appellant had been to prison in 1996, and appellant's ex-girlfriend testified that she began her relationship with appellant when he was released from the penitentiary in 2006. In addition, appellant's mother testified that appellant had been in prison for ten years. The pen pack indicated that appellant had been convicted of aggravated assault and sentenced to ten years in prison. The pen pack also contained head shots of appellant's face, front and side views and a fingerprint card containing his full name, birth date, height, weight, and other personal descriptions, including tattoos. Photographs of appellant's tattoos were also admitted for comparison by the jury.

25

should find that trial counsel rendered ineffective assistance because the case "presents one of those rare instances in which ineffective assistance can be shown on the direct appeal."

We have determined that appellant's complaint regarding Ruiz is without merit because Ruiz's testimony did not address relevant facts to which appellant was not privy. *See Drew*, 743 S.W.2d at 229. Thus, we have not concluded that appellant's trial counsel failed to preserve this issue for our review by not "forcing" Ruiz to plead the Fifth Amendment privilege on the record. Appellant makes no other arguments to support his claim that trial counsel rendered ineffective concerning Ruiz's failure to testify. We overrule his final issue in this regard.

Next, appellant argues that if we "hold[] there was no specific request to replace Juror Garza (despite a 50[-]page hearing on the issue after which the trial court declared it would not replace him), trial counsel was ineffective for failing to make a specific request to remove a juror who demonstrated bias against the defendant." We did not make such a holding; therefore, we overrule appellant's final issue in this regard.

Finally, appellant complains that if we conclude that trial counsel failed to preserve any error, we should find trial counsel ineffective. We have concluded that trial counsel did not object to the fingerprint expert's qualifications. However, appellant does not address how he was prejudiced by trial counsel's omission.[8] *See Goodspeed v. State*, 187 S.W.3d 390, 392 (Tex. Crim. App. 2005) (citing *Strickland*, 466 U.S. at 687). We overrule appellant's final issue in this regard.

---

[8] During the trial, appellant's trial attorney asked the fingerprint expert several questions regarding his methodology. It is possible that trial counsel did not object because the fingerprint expert adequately explained his methodology. However, aside from his bare assertion, appellant has not presented any argument with citation to appropriate authority regarding this issue. *See* Tex. R. App. P. 38.1(i).

## X.     CONCLUSION

We affirm the trial court's judgment.

_____
ROGELIO VALDEZ
Chief Justice

Do not publish.
TEX. R. APP. P. 47.2(b).

Delivered and filed the
9th day of January, 2014.

27