

# NUMBER 13-19-00434-CR

# COURT OF APPEALS

# THIRTEENTH DISTRICT OF TEXAS

# CORPUS CHRISTI – EDINBURG

THE STATE OF TEXAS,                                                          Appellant,

v.

ABRAHAM ARRIAGA MARTINEZ,                                       Appellee.

## On appeal from the 93rd District Court
## of Hidalgo County, Texas.

## MEMORANDUM OPINION

### Before Justices Benavides, Longoria, and Tijerina
### Memorandum Opinion by Justice Longoria

Appellee Abraham Arriaga Martinez was tried and convicted of two counts of aggravated sexual assault of a child. *See* TEX. PENAL CODE ANN. § 22.021(a)(2)(B). Appellee was sentenced to thirty years' confinement on both counts, to run concurrently. Appellee filed a post-judgment motion for new trial, which the trial court granted. Appellant, the State of Texas, appeals the trial court's granting of appellee's motion for

new trial arguing that the trial court abused its discretion when it granted appellee's motion based on newly discovered evidence. We reverse and remand.

## I.    BACKGROUND

Appellee was indicted for two counts of aggravated sexual assault of a child occurring on or about April 21, 2017; his two alleged victims being his sons Edgar and David.[1]

### A.    Trial

At trial, Edgar and David's mother, E.G.F., testified that she and appellee dated on and off beginning when she was approximately fifteen years old and appellee was twenty years old. Appellee and E.G.F. had two children together, Edgar and David. E.G.F. has a third child, K.M., and appellee is not the father.

E.G.F. testified that in April 2017, K.M., an infant at the time, became ill and she brought him to the hospital where she and K.M. stayed overnight. During the overnight hospital stay, Edgar and David remained home in appellee's care. After returning from the hospital, she testified that Edgar and David were "a little strange," but that she asked if anything had happened and they said everything was "fine." A few days later E.G.F. was cleaning her sons' room and found a condom wrapper, which she thought was strange, but she threw it away. She stated that she asked Edgar and David if they wanted to tell her anything, and that is when Edgar told her about the sexual abuse, stating that his father, appellee, had sucked his penis.[2] Edgar told her that it had happened in his

---

[1] We use pseudonyms or initials to refer to the children and other family members. *See* TEX. FAM. CODE ANN. § 109.002(d); *see also* TEX. R. APP. P. 9.8.

[2] E.G.F. testified through a Spanish interpreter and clarified that when Edgar said "wuevitos" which translates to "little balls," he meant "his penis."

2

bedroom that he shared with David. When Edgar told her this, she testified that he was "worried and afraid" because appellee had "threatened him."

When Edgar told E.G.F. what happened, David heard what he said and "then he talked." David told her that appellee had also abused him, and from what he told her, E.G.F. understood David to mean that appellee put his penis inside David's butt.[3] David also stated that the abuse occurred on the same night that E.G.F. was in the hospital with K.M. and that it happened in his bedroom which he shared with Edgar.

E.G.F. testified that in the two weeks prior to her sons' outcries of sexual abuse, she had witnessed her brother, D.V., "fondling or touching" David. She stated that she saw D.V. "kissing [her] son in his rear part." She confronted her brother and her mother, who live in a neighboring apartment, but she did not notify the police. She also testified that, after the outcry against appellee, Edgar told her that E.G.F.'s other brother, R.G., who also lived in the neighboring apartment, had sexually assaulted him several times by putting "his little balls in [Edgar's] little butt." She reported the outcry to the police a few days after she reported the outcries against appellee.

Following the outcry, E.G.F. reported what her sons had told her to their school counselor, who called the police and the Department of Family Protective Services (CPS). She was instructed to take the boys to the hospital for a forensic exam. She and the children relocated to Mujeres Unidas, a shelter, to keep them safe from appellee who had not yet been arrested. When she returned to her apartment approximately one month later, after appellee's arrest, she found another condom wrapper on top of the kitchen cabinets.

---

[3] E.G.F.'s testimony of what David said literally translated to appellee having put his "little balls" into David's "little tail."

3

Since the outcries, E.G.F. testified that the boys' behavior has been "difficult" and that they sometimes play inappropriately by touching each other. She testified that the boys are seeing a counselor who they have had previously seen "before the events happened" because of behavioral issues at school. Edgar was also put on medication for attention deficit hyperactivity disorder (ADHD) and depression.

On cross-examination, E.G.F. confirmed that Edgar and David had been sexually abused by multiple people, specifically their uncles and their father. She also testified that during the time after she had returned home from the hospital and before the outcries, she did not notice her sons in any discomfort when sitting or any blood in their stool, though she did not check for such abnormalities.

Edgar, eight years old at the time of trial, testified that when his mother, E.G.F. was in the hospital with K.M., he and David stayed with their father. He believed that his mother was giving birth to K.M. at that time. While in his father's care, his father "licked [Edgar's] middle part." When asked to circle "middle part" on a male diagram, Edgar circled the penis. He said that his father told him not to tell his mother what had happened. Edgar was unable to identify his father in the courtroom but said that it had been a long time since he had seen him. Edgar also testified that his uncle R.G. also "licked [his] middle part."

David, seven years old at the time of trial, testified that the same night that Edgar was sexually abused by his father, his father "put his wee-wees in [David's] cola." When asked to circle "wee-wees" and "cola" on a male diagram, he circled the penis and the buttocks. David stated that it made him feel "bad" and he "was screaming it hurts." He also said that his father told him not to tell his mother what had happened. David also

4

testified that he witnessed his father "lick [Edgar's] wee-wees" the same night. David testified that he had four brothers, but he included his uncles R.G. and D.V. when stating who his brothers were. David stated that D.V. also sexually assaulted him the same way that his father had.

Sandra Gonzalez, the boys' school counselor, testified that when there is an outcry of sexual abuse from a student, it is protocol to inform CPS and the police department. Gonzalez recalled E.G.F. coming into her office "crying hysterically" and informing her that the boys were sexually abused by their father. Gonzalez called the police department to notify them and involve them from the start. She did not further involve herself, aside from informing the principal and possibly discussing the situation with the boys' teachers.

Officer Martin Gomez with the Pharr Police Department (Pharr P.D.) testified that he was dispatched to an elementary school in Pharr in reference to an allegation of sexual assault against a child. When he arrived at the school, he first made contact with the counselor and then with E.G.F. He recalls that there were three allegations of sexual assault and two perpetrators; one was the father of the children and the other was the uncle. Officer Gomez took the statement of E.G.F. and coordinated with an investigator from Pharr P.D. regarding the next steps in the investigation. He did not speak with the children, as it is procedure to have the children discuss the trauma with an investigator. Officer Gomez advised E.G.F. to take the children to the hospital for a sexual assault examination.

Investigator Enrique Ontiveros with Pharr P.D. testified that he was called by Officer Gomez in reference to the initiation of a report of aggravated sexual assault. Investigator Ontiveros was informed that the report was initiated at an elementary school

5

and involved two boys. The boys accused appellee of having sexually assaulted them. Upon receiving the call, Investigator Ontiveros advised Officer Gomez that the boys should receive a sexual assault examination and instructed Officer Gomez to advise the boys' mother to take them to the hospital for the examination.

A forensic interview at the children's advocacy center (CAC) was set up. Investigator Ontiveros explained that the forensic interview is used, in part, to corroborate the preliminary report and to see if the children make the same outcry as they did to E.G.F. He explained that the investigators watch the interview as it occurs through video, but do not interview the children themselves because they "want them to feel more comfortable" with the people at the CAC. He was not the investigator present for the forensic interview, but he reviewed both of the boys' interviews, which were recorded, and both boys accused appellee of sexual assault. The boys also alleged that they were sexually assaulted by their uncles; reports were generated, but no charges were filed. Investigator Ontiveros photographed the apartment where the boys alleged the sexual abuse occurred. Appellee was arrested based upon the allegations in the interviews. After his arrest, appellee voluntarily spoke with Investigator Ontiveros and denied the allegations. As part of his investigation, Investigator Ontiveros collected a condom wrapper that E.G.F. found in the apartment. Investigator Ontiveros took E.G.F.'s statement, during which he said she appeared to be in "shock" over what was happening.

During cross-examination, Investigator Ontiveros noted that the sexual assault examination resulted in no findings of any trauma. It was noted during the forensic examination that the boys were considered "nonverbal," which, according to Investigator

6

Ontiveros, meant that the boys spoke in "baby-talk" and "gibberish" during the interview, but he stated that the outcry could still be understood.

Zuhey Sifuentes, the CPS investigator in this case, testified that after receiving the initial call that there had been an outcry of sexual assault, she went to the school to talk to the children. She testified that she interviewed Edgar and David regarding their outcries of sexual abuse. Edgar was "nervous" and asked her not to tell anyone what he was saying "because his dad was going to hit him." David was not fearful and told her what had happened to him. As part of the interview, Sifuentes determined that both children were able to distinguish between the truth and a lie.

Based on her complete investigation, Sifuentes found that there was "reason to believe," meaning a finding of sufficient information, that Edgar had been sexually abused by appellee and by D.V. The disposition also included a finding of "unable to determine" abuse of Edgar by R.G, meaning that there was some information to determine abuse occurred, but not enough to meet the guidelines. As it related to David, Sifuentes' investigation led to a disposition of "reason to believe" that he had been sexually abused by appellee.

The CAC forensic interviewer, Sara Munguia, testified that she interviewed Edgar and David. Edgar was six years old when she interviewed him, and she explained that he was very talkative and moved around the room quite a bit during the interview, which she explained was typical for a child his age. She stated that Edgar was able to identify the parts of the male body on the provided anatomical drawing, and in doing so, he indicated the type of sexual abuse that had occurred. David, five years old at the time of his interview, behaved similarly to his brother, but was also still able to communicate with

7

Munguia. Munguia testified that while David was distracted at times during the interview, he was able to identify his abusers and explain the sexual abuse that occurred.

On cross-examination, Munguia confirmed that both boys often lost their focus and at one point, David began talking about boys from his school; however, she explained that while she would redirect them to what they were talking about, she did not have any goal of what she wanted the children to testify to. While she knew what the allegations were prior to meeting with the children, it was her job to let them tell their story.

Martha Adame, a licensed professional counselor, testified that she treats David and Edgar. She initially began treating the boys in 2014 upon receiving a referral for ADHD but stopped seeing them for some time. When the allegations of sexual abuse came out, E.G.F. brought David and Edgar back to her for counseling. She currently treats Edgar for ADHD, post-traumatic stress disorder (PTSD), anxiety, and depression. Edgar has consistently informed Adame that "his father licked his wee-wees," which he indicated were his "private parts." Edgar also told her that his uncle R.G. also sexually abused him. Adame indicated that there was also some concern regarding inappropriate sexual behavior between Edgar and David.

Adame testified that her treatment of David is for ADHD, anxiety, and PTSD. David has shown some confusion about who his biological father is and sometimes thinks his father is his stepfather. Adame testified that his confusion has caused him to deny sexual abuse by his father because he thought he was being asked about his stepfather. However, she stated that when the confusion was cleared up, David alleged sexual abuse by his father, appellee. David told Adame that his father put "his wee-wees in my butt."

8

David also stated that he saw his father perform oral sex on Edgar. There was also an allegation that D.V. sexually abused David.

Araceli Pena, a registered nurse who is certified as a sexual assault examination nurse, testified that she conducted sexual assault examinations on Edgar and David when they were six and five years old, respectively. Pena indicated that her examinations vary depending on the time between the sexual abuse and the examination. If the examination is within 96 hours, she will collect certain evidence from the examination; however, after 96 hours, there is no evidence collection kit because studies show it would be "non-conclusive." Here, Pena collected oral, penile, and anal swabs and performed full body examinations of Edgar and David because the examinations fell within the 96-hour window. No trauma was noted for either child, but Pena testified that "Out of the almost over a thousand that I've seen, 70 percent of the cases personally that I've seen, I haven't had trauma." Pena further testified that each child alleged that they had been sexually abused by appellee in conformity with their initial outcries.

On cross-examination, focus was placed on the fact that no trauma was noted on David, who alleged that his father sexually assaulted him by putting his "wevos," or "balls," in David's "cola," or "butt." Pena, however, maintained that it was not unusual to find no trauma as the anus is a muscle meant to expand and contract.

Peggy Cuevas, a forensic scientist with the Texas Department of Public Safety (DPS) testified that she performed the biological screening on the sexual assault kits for Edgar and David. She concluded that "there was no biological fluids on [the] evidence." Alejandro Vasquez, also a forensic scientist with DPS, testified that he was tasked with "identifying biological fluids, such as semen or blood" on the sexual assault kits for Edgar

9

and David; no biological fluids were found. Joan Del Rio, a former DPS forensic analyst, performed the technical review of the DNA analysis for Edgar and found no DNA from appellee. Del Rio performed the DNA analysis on David's sexual assault kit and appellee was excluded as a contributor. Del Rio testified that the time period between when the sexual assault occurred and when the samples were taken could have had an impact on whether DNA from appellee would be present because of things such as bathing and using the restroom as well as how much DNA was present from the assault.

The jury returned a guilty verdict on both counts of aggravated sexual assault of a child. The trial court sentenced appellee to thirty years' imprisonment on each count, to run concurrently.

## B.    Motion for New Trial

Appellee filed a timely motion for new trial arguing that there was newly discovered evidence. *See* TEX. CODE OF CRIM. PROC. ANN. art. 44.001. Specifically, appellee urged that a previously unknown witness, Edgar Alejandro Gonzalez Lara, "came forward to state that he had been involved in a personal relationship" with E.G.F. Lara, according to appellee's motion, would testify that E.G.F. "admitted to him that she had fabricated the allegations made against" appellee. A sworn affidavit of Lara was attached to the motion for new trial.

At the hearing on the motion for new trial, Lara was called to testify. He explained that he worked with appellee for "like 10 years" at a mechanic shop. When appellee stopped showing up for work, Lara stated that he reached out to E.G.F. to find out where appellee was and that she informed him that appellee was in jail. Lara offered to help financially, and E.G.F. suggested he wait until after 11:00 p.m. to come by with money.

10

Lara testified that he and E.G.F. engaged in sexual relations before he gave her the money to help appellee. Subsequently, he and E.G.F. engaged in a sexual relationship for "like two months, two months and a half" while appellee was in jail.

Lara explained that he did not believe the allegations against appellee were true and that one evening, when he was with E.G.F. and she began drinking, E.G.F. told him that appellee did not sexually assault the children but that he had "hurt [her] a lot" by cheating on her and that she could not now take the charges away because she would "lose her visa U." Lara further testified that E.G.F. stated she was in a sexual relationship with an investigator in the case.

On cross-examination, Lara testified that he was told that appellee had been sentenced to thirty years' imprisonment after appellee's parents went to the mechanic shop looking for letters for appellee's sentencing hearing. Lara attempted to contact appellee but was unsuccessful. Lara agreed that there was no way for him to know whether appellee had committed the offenses he was charged with. Lara also confirmed that he had a criminal history and that one of his past crimes was giving false information to an officer. Lara informed the court that he told appellee's parents what E.G.F. had told him.

Antonio Martinez, appellee's father, testified that he and his wife went to appellee's place of employment seeking character letters for appellee's sentencing hearing. After they left the mechanic shop, he received a text from Lara stating that he wanted to speak with him. Lara told Antonio "I know your son, I know his wife, and I know the truth. I'll go wherever you want to go." Antonio testified that Lara told him the information about E.G.F. and that Antonio then called appellee's counsel. Antonio, on cross-examination, testified

11

that he believed his son to be innocent but agreed that there was no way for him to be certain that the accusations were false.

At the conclusion of the hearing, appellee's counsel sought a new trial based on the newly discovered evidence. The State argued that the newly discovered evidence was merely impeachment testimony "based on hearsay," and would be inadmissible at trial; therefore the State argued that appellee's motion for new trial should not be granted. The trial court granted appellee's motion for new trial. The State appealed.

## II.    DISCUSSION

The State argues that the trial court abused its discretion in granting appellee's motion for new trial. Specifically, the State contends that appellee failed to meet the statutory requirement of materiality because appellee's "'newly discovered' evidence presented to the trial court was merely impeaching" and "would not have brought about a different result at his trial."

## A.    Standard of Review & Applicable Law

The trial court has discretion when deciding whether to grant a new trial based on newly discovered evidence, and absent an abuse of discretion, we will not reverse its ruling. *Keeter v. State*, 74 S.W.3d 31, 37 (Tex. Crim. App. 2002). An abuse of discretion occurs only if the trial judge acted arbitrarily and in a manner that was clearly erroneous. *Okonkwo v. State*, 398 S.W.3d 689, 694 (Tex. Crim. App. 2013). Put another way, an abuse of discretion occurs only if no reasonable view of the record—seen in the light most favorable to the trial court's ruling—supports the trial court. *Id*. The question is not how we would have viewed the facts or how we would have ruled. *Id*. We uphold the trial court if its ruling falls within the zone of reasonable disagreement. *Wead v. State*, 129 S.W.3d

12

126, 129 (Tex. Crim. App. 2004); *see also Scoggins v. State*, No. 02-19-00209-CR, 2020 WL 5241197, at *4 (Tex. App.—Fort Worth Sept. 3, 2020, pet. ref'd) (mem. op., not designated for publication).

A defendant has a right to a new trial when material evidence favorable to him has been discovered after trial. TEX. CODE CRIM. PROC. ANN. art. 40.001. In order for a defendant to be entitled to a new trial on the basis of newly discovered or newly available evidence, the following four-pronged test must be satisfied:

(1) the newly discovered evidence was unknown or unavailable to the defendant at the time of trial;

(2) the defendant's failure to discover or obtain the new evidence was not due to the defendant's lack of due diligence;

(3) the new evidence is admissible and not merely cumulative, corroborative, collateral, or impeaching; and

(4) the new evidence is probably true and will probably bring about a different result in a new trial.

*Carsner v. State*, 444 S.W.3d 1, 2–3 (Tex. Crim. App. 2014). Courts do not favor motions for new trial based on grounds of newly discovered evidence and view them with great caution. *Frank v. State*, 183 S.W.3d 63, 71 (Tex. App.—Fort Worth 2005, pet. ref'd) (citing *Drew v. State*, 743 S.W.2d 207, 225 (Tex. Crim. App. 1987)).

**B.    Analysis**

The State does not contest the first two prongs as established in *Carsner*, as Lara testified that he did not provide the information to anyone associated with appellee until after sentencing occurred. As to the third prong, the State argues that the testimony of Lara is inadmissible hearsay and acts merely as impeachment evidence. Appellee argues that the statements made by E.G.F. to Lara are admissible under exceptions to the

13

hearsay rule, specifically arguing that E.G.F.'s statements were against her own interest or to show her then existing state of mind. *See* TEX. R. EVID. 803(3), 803(24). Even if we assume the evidence was admissible, we agree with the State that appellee did not satisfy the fourth prong because the statements would not have altered the outcome of the trial given the evidence presented against appellee.

### 1.      Fourth Prong

While the State argues that the alleged statements made by E.G.F. to Lara go solely to E.G.F.'s credibility, the statements have a much larger implication—that the allegations were fabricated by E.G.F. However, while we do not doubt that the newly discovered evidence was "possibly useful to the defense," *see Giglio v. United States*, 405 U.S. 150, 154 (1972), we cannot agree that the evidence would have materially altered the outcome of the trial had it been made available. *Burdick v. State*, 474 S.W.3d 17, 23 (Tex. App.—Houston [14th Dist.] 2015, no pet.).

The jury was presented with direct testimony of the children as well as testimony from sexual assault nurse examiner, the CPS interviewer, the CAC forensic interviewer, and the children's counselor. The testimony was consistent that the children's story aligned with the outcry and the counselor testified that both children show emotional symptoms of sexual abuse. In order to materially alter the outcome of the trial, the statements by Lara would need to cause the jury to believe Lara's testimony and allow it to discredit the children and the remaining corroborating evidence, which was substantial. In this regard, the uncorroborated testimony of a child sexual assault victim alone is sufficient to support a conviction for sexual assault of a child. *See* TEX. CODE. CRIM. PROC. ANN. art. 38.07(a). There is no requirement that physical, medical, or other evidence be

14

proffered to corroborate the victim's testimony. *Garcia v. State*, 563 S.W.2d 925, 928 (Tex. Crim. App. 1978); *Sandoval v. State*, 52 S.W.3d 851, 854 n. 1 (Tex. App.—Houston [1st Dist.] 2001, pet. ref'd). Thus, appellee failed to satisfy the fourth prong of the controlling test for newly discovered evidence. *See Carsner*, 444 S.W.3d at 2–3.

### 2. False Material Testimony

In his appellate brief, appellee argues in the alternative that "the State's procurement of a conviction or punishment by the use of false material testimony violates a defendant's constitutional right to due process." A false-evidence claim must be supported by facts showing that some evidence was presented to the jury that was demonstrably false or misleading. *Ukwuachu v. State*, 613 S.W.3d 149, 155 (Tex. Crim. App. 2020), reh'g denied (Jan. 13, 2021) (citing *Ex parte De La Cruz*, 466 S.W.3d 855, 866 (Tex. Crim. App. 2015)).

The use of material false testimony to procure a conviction violates a defendant's due process rights under the Fifth and Fourteenth Amendments to the United States Constitution. *Ex parte De La Cruz*, 466 S.W.3d at 866. Therefore, in any claim alleging the use of material false testimony, a reviewing court must determine: "(1) whether the testimony was, in fact, false, and, if so, (2) whether the testimony was material." *Ex parte Weinstein*, 421 S.W.3d 656, 665 (Tex. Crim. App. 2014). Appellee contends that Lara's testimony proves that E.G.F.'s testimony was false; however, aside from that contention, there is nothing to show that her testimony "was, in fact, false." Disagreements in testimony do not constitute the use of false testimony. *Onate v. State*, 62 S.W.3d 208, 212 (Tex. App.—El Paso 2001, pet. ref'd) (citing *Tucker v. State*, 15 S.W.3d 229, 234 (Tex. App.—Houston [14th Dist.] 2000, pet. ref'd)). Had Lara testified in trial, it would have

amounted to a he-said/she-said situation, which does not prove that E.G.F.'s testimony was false, as required. *See Ukwuachu,* 613 S.W.3d at 155.

Accordingly, the State's sole issue is sustained.

### III.    CONCLUSION

We reverse the judgment of the trial court's order granting a new trial and remand for proceedings consistent with this opinion.

NORA L. LONGORIA
Justice

Do not publish.
TEX. R. APP. P. 47.2(b).

Delivered and filed on the
11th day of March, 2021.